# Exhibit C

```
1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2


3    _____

4    UNITED STATES OF AMERICA,

5                        Plaintiff,        Criminal Action
                                           No. 22-10274-DJC
6    V.
                                           March 5, 2024
7    FRANK LoCONTE,                         11:03 a.m.

8                        Defendant.
     _____

9


10


11               TRANSCRIPT OF SENTENCING DAY 1

12           BEFORE THE HONORABLE DENISE J. CASPER

13               UNITED STATES DISTRICT COURT

14           JOHN J. MOAKLEY U.S. COURTHOUSE

15                   1 COURTHOUSE WAY

16                   BOSTON, MA  02210

17


18


19


20            DEBRA M. JOYCE, RMR, CRR, FCRR
21                 Official Court Reporter
             John J. Moakley U.S. Courthouse
22             1 Courthouse Way, Room 5204
                   Boston, MA  02210
23                 joycedebra@gmail.com

24


25
```

```
1   APPEARANCES:

2   FOR THE GOVERNMENT:

3   LAURA KAPLAN, ESQ.
    United States Attorney's Office
4   John Joseph Moakley Federal Courthouse
    1 Courthouse Way
5   Suite 9200
    Boston, MA 02210
6   617-748-3124
    laura.kaplan@usdoj.gov
7
    FOR THE DEFENDANT:
8
    MICHELLE R. PASCUCCI, ESQ.
9   GEORGE W. VIEN, ESQ.
    Donnelly, Conroy & Gelhaar, LLP
10  Suite 1600
    260 Franklin Street
11  Boston, MA 02110
    617-720-2880
12  mrp@dcglaw.com
    gwv@dcglaw.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1
2          (The following proceedings were held in open
3    court before the Honorable Denise J. Casper, United States
4    District Judge, United States District Court, District of
5    Massachusetts, at the John J. Moakley United States Courthouse,
6    1 Courthouse Way, Boston, Massachusetts, on March 18, 2024.
7          The defendant, Frank LoConte, is present with counsel.
8    The Assistant U.S. Attorney is present.)
9          THE CLERK:  All rise.
10         (The Court entered the courtroom.)
11         THE CLERK:  Court is in session.  Please be seated.
12         Criminal action 22-10274, United States v. Frank
13   LoConte.
14         Would counsel please state your name for the record.
15         MS. KAPLAN:  Good morning, your Honor.  Laura Kaplan
16   on behalf of the government.
17         THE COURT:  Good morning.
18         MS. PASCUCCI:  Good morning, your Honor.  Michelle
19   Pascucci on behalf of Mr. LoConte.
20         THE COURT:  Good morning.
21         MR. VIEN:  And, also, George Vien on behalf of
22   Mr. LoConte, your Honor.  Good morning.
23         THE COURT:  Good morning.
24         Good morning, sir.
25         THE DEFENDANT:  Good morning.

1    THE COURT:  And I see that Probation is represented

2  here.

3    PROBATION OFFICER:  Yes, your Honor.  David Mills of

4  U.S. Probation.

5    THE COURT:  Good morning.

6    Counsel, Mr. LoConte, I know we're here for

7  sentencing.  I've had a chance to review all of the materials

8  that were filed on either side.  As I think Ms. Hourihan may

9  have alerted you, given the vast dispute over loss amount, I

11:04 10  may do this hearing in two parts and hear you on your

11  respective positions on loss amounts -- I know there's also, I

12  think, a disagreement about abuse of trust -- and take the

13  matter under advisement before pronouncing sentence.

14    So, counsel, before we begin, let me just make sure

15  I've reviewed all of the written materials the parties wanted

16  me to.

17    I've received and reviewed the presentence report as

18  revised January 16th.

19    I've reviewed Mr. LoConte's sentencing memo filed

11:05 20  January 16th, which had a bunch of attachments, including

21  letters of support from friends and family.  There were also a

22  number of exhibits that were related to some civil proceedings

23  which I understand are leading to some of the nature of dispute

24  about the loss amounts.

25    In the defendant's sentencing memo there was a

1 reference to exhibits submitted to Probation.  I'm assuming the

2 attachments I received are the same exhibits?

3    MS. PASCUCCI:  No, your Honor.  We submitted a letter

4 regarding objections to Jennifer Dailey of Probation --

5    THE COURT:  Can you just move the mic closer and keep

6 your voice up a little just so I can hear you?

7    MS. PASCUCCI:  Of course, thank you, your Honor.  I

8 can also raise my voice.

9    We sent a letter to Jennifer Dailey of Probation that

11:05 10 included five exhibits, and those exhibits weren't separately

11 submitted with our sentencing memo.  But if you would like us

12 to file those with the Court in the interim before you have the

13 other sentencing hearing on this, we can do so.

14    THE COURT:  And just broadly speaking, what did the

15 five concern?

16    MS. PASCUCCI:  Yes, your Honor.  So this was the TD

17 Bank long form and stock purchase agreement, and this goes to

18 some of the argument regarding the underlying facts in the

19 case.

11:06 20    THE COURT:  So -- and this is the agreement as of

21 2013?

22    MS. PASCUCCI:  Yes.

23    THE COURT:  And so wasn't -- that was not attached?

24    MS. PASCUCCI:  Your Honor, I do not believe that was

25 separately attached to our sentencing memo.

1          THE COURT:  Okay.

2          I thought I did see copies of the documents that

3     reflected the initial agreement between Mr. LoConte and NER.

4          MS. KAPLAN:  Are you thinking -- there was a footnote,

5     I think, where defendant said -- it's the Excel spreadsheet

6     that you couldn't attach.  I wonder if that's --

7          THE COURT:  Well, there was reference to that, and I

8     was getting to that, but there was also reference to these

9     exhibits to Probation, and I just wanted to make sure that I

11:07 10    had everything.

11          MS. PASCUCCI:  Yes, your Honor.  I don't believe that

12    we submitted those with our sentencing memo.  Those were just

13    submitted with Probation, if my memory is correct.

14          THE COURT:  Okay.

15          And the Excel spreadsheet, which Ms. Kaplan

16    referenced, was referenced in a footnote,

17          MS. PASCUCCI:  Yes, it was, your Honor.

18          THE COURT:  Again, what is that -- what was contained

19    there?

11:07 20    MS. PASCUCCI:  Sure, your Honor.

21          This was an Excel spreadsheet that was provided to us

22    by the government.  Basically it goes over the loss to the

23    benefit funds to the laborers and the bricklayers and organized

24    check by check and payment by payment.

25          And the reason we didn't submit it, which was

discussed briefly in the footnote, which this is an interactive
spreadsheet. So, as you can with Excel, you can exclude entire
categories of checks. So it doesn't lend itself to being PDF'd
and then submitted with a sentencing memo, but that is
something we could also separately provide to the Court over
email.

      THE COURT: Okay.

      And then, counsel, let me go through the rest of the
written materials I reviewed.

      I also reviewed the government's sentencing memo filed
January 9th, the government's supplemental memo filed February
6th.

      I know there was a motion to strike that supplemental
memo. I haven't struck it, but I did read the motion to strike
substantively, which was filed February 8th.

      And then, separately, there were two victims -- victim
letters, one from an accounting firm and one from one of the
funds.

      I think other than the exhibits that may have been
separately submitted to Probation, those are all the other
written materials.

      Counsel, is there anything else?

      MS. KAPLAN: I believe that's it, your Honor.

      MS. PASCUCCI: Yes, your Honor, I agree.

      THE COURT: And, counsel, have you had a chance to

1    review the presentence report with Mr. LoConte?

2           MS. PASCUCCI:  Yes, your Honor, we have.

3           THE COURT:  And if I understand it -- and counsel

4    can -- I'll hear both sides on this, but I think there was a

5    disagreement about the grouping of Counts One and Ten together.

6    I think there's a disagreement about a loss amount, although --

7    and counsel can correct me if I'm wrong -- I think that

8    disagreement was about Count Two and not Count One, and I think

9    there was also a disagreement about the abuse of trust.  I know

11:09 10   there's no dispute about the Criminal History Category.  Is

11   that a fair summary?

12          MS. KAPLAN:  I think more or less, but I'll let

13   defendant respond.  I think the loss amount may still be an

14   issue, even as to Count One.

15          THE COURT:  Okay.

16          MS. PASCUCCI:  Yes, your Honor.

17          And to put a finer point on that, while we fall into

18   the same sentencing bracket on Count One, we do disagree as to

19   the specific loss amount in Count One.

11:09 20          THE COURT:  Okay.

21          So it's loss amounts as to both the mail fraud count

22   and the failure to pay tax count.  But, otherwise, how I

23   summarized the disagreement is where we are?

24          MS. PASCUCCI:  Yes, your Honor.

25          THE COURT:  So why don't we start on the loss amount.

1      And, counsel, I'll just -- in the materials that were

2 submitted -- I have a few of them.  I have your memos on either

3 side before me.  I, also, in particular, have page 5 from

4 Mr. LoConte's sentencing memo, Docket 80, at 5, which had a

5 chart summarizing the disagreement between the parties about

6 the loss amount.

7      Ms. Kaplan, I know you disagree with their

8 calculation, but do you agree with their summary of the

9 government's position?

11:10 10      I'll give you a moment.

11      MS. KAPLAN:  If I could just have a moment, your

12 Honor, to get their memo.

13      (Pause.)

14      MS. KAPLAN:  So, can you repeat your question?

15      THE COURT:  Sure.

16      So even though I understand the parties disagree about

17 what the loss amount should be calculated as, do you agree that

18 what is represented as the government's loss calculation on the

19 table on the bottom of page 5 of Docket 80 is accurate?

11:11 20      MS. KAPLAN:  Yes, I do.

21      THE COURT:  Okay.

22      So just, counsel, why don't I -- Ms. Kaplan, why don't

23 I hear from you as to the loss calculation for Count One first,

24 and then we'll go from there.

25      MS. KAPLAN:  Okay.

1        Your Honor, I -- for the most part, I'm going to rely

2   on the government's sentencing memo and the supplemental

3   sentencing memo which -- and the exhibits that are attached

4   which detail how the loss amount was calculated for Count One.

5        The government believes that for Count One only, the

6   loss amounts attributable to the Title 18 violation, which is

7   $1,094,504 can be used, which increases the offense level by 14

8   because the loss is more than $550,000 but not more than

9   $1,500,000, and accordingly, defendant's base offense level for

11:12 10   Count One is 21.

11        How this loss amount of the $1,094,504 for the benefit

12   funds was calculated is explained in the affidavit of Christian

13   Ruehrwein from the Department of Labor, it's Exhibit 1 to the

14   government's sentencing memo, and it's corroborated by

15   documents that are attached to his affidavits, which include

16   every single non-payroll check and -- as well as some other

17   documents.

18        It also is corroborated by the letter submitted by

19   Nathan Goldstein, who is the executive director of Mass.

11:13 20   Laborers' Benefits Funds, which reached a similar but somewhat

21   lower figure, given that they did not have access to all of the

22   records that the government did.

23        The defendant seeks to reduce this number because he

24   argues that work was not being done --

25        THE COURT:  And, I'm sorry, just to back up.

1          So that amount represents what?  It amounts -- it

2    reflects the underreporting of payments?

3          MS. KAPLAN:  Yes, the off-the-books payments to the --

4          THE COURT:  So the $1 million are payments that were

5    made to -- off-the-book payments that were made for which no

6    taxes were --

7          MS. KAPLAN:  No.  This is just -- well, yes, this is

8    the amount of money that was not paid to the benefit funds for

9    the fringe benefits.

11:13 10          THE COURT:  Okay.

11          MS. KAPLAN:  And that's further broken down --

12          THE COURT:  So, meaning -- so that doesn't represent

13    the monies actually paid, it's the monies that were due if they

14    had been paid in the proper and legal course.

15          MS. KAPLAN:  Correct.

16          THE COURT:  Okay.

17          MS. KAPLAN:  And that figure is further broken down

18    by -- with $823,774 going to the Massachusetts Laborers'

19    Benefit Funds, and $270,730 going to the bricklayers, or that

11:14 20    should have gone to the bricklayers.

21          THE COURT:  Okay.

22          And, counsel, I know your sister is going to point

23    this out, but is there some dispute about which amount is

24    attributable to which of these groups?

25          MS. KAPLAN:  Yes.  Apparently, it was in the

circumstances where actual cash was paid to some of the
laborers it was difficult to make an attribution to whether it
was laborers or the bricklayers, but in one of the -- in the
defendant's sentencing memo, they said that in 2018 or 2019
that the bricklayers stopped receiving cash, so that money was
taken from what was attributable to the bricklayers and put on
the account of the laborers because, clearly, it was monies
that were not paid to these various benefit funds as -- that
should have been paid for the fringe benefits.

11:15 10          THE COURT:  Okay.

And anything else as to the benefit funds, or should I
ask you about Count Ten?

MS. KAPLAN:  No, I've got a little bit more, your
Honor.

THE COURT:  Okay.

MS. KAPLAN:  So the defendant wants to reduce the
number, this loss number for Count One, because he argues that
work was not being done in the winter months and he wants,
without any real explanation, to exclude non-payroll checks

11:16 20 under $2,000.  And both arguments, the government submits,
fail, as Department of Labor Agent Ruehrwein explains in his
affidavit attached to the government's supplemental memo, that
work was actually being done during the winter months and there
was ample proof that checks in the amount of $2,000 or less
were checks -- were amounts that should have been paid as

1  payroll checks or were paid as payroll checks.

2      With respect -- so that's what I wanted to say with

3  respect to Count One, your Honor.

4      THE COURT:  Okay.

5      And actually, why don't we switch over so I can hear

6  the opposition to this while it's still in my brain, counsel.

7      MS. PASCUCCI:  Your Honor, we would posit that the

8  loss under Count One should be approximately $568,000.  There

9  are two groups of loss that are embodied here, one is loss to

11:16 10  the laborers' union and the other is loss to the bricklayers'

11  funds.  And if you go back to the government's PSR, the loss to

12  the laborers was $455,000, and we didn't object to that because

13  that fell within the settlement between NER and the laborers,

14  and we feel --

15      THE COURT:  So, meaning, on your chart on page 5,

16  you're not objecting to the -- right, okay.

17      So just to the amount to the laborers, okay.

18      MS. PASCUCCI:  And to be clear, it's the amount to the

19  laborers that's reflected in the PSR, not in the government's

11:17 20  sentencing memo.

21      And --

22      THE COURT:  Meaning in their submission to Probation.

23      MS. PASCUCCI:  Yes.

24      THE COURT:  Okay.

25      And the loss to the laborers were reflected in

 1    non-payroll checks.

 2            Now, the loss to the bricklayers, by contrast, was in

 3    this category called office staff cash.  And what this was, was

 4    checks that were made to employees, cashed, and then paid to

 5    union workers.  And there's nothing on the face of these checks

 6    saying this is part of Flowers or this is part of the

 7    under-the-table program.

 8            And looking through these checks category by category

 9    we saw reasons to exclude many of these checks.  And we said,

11:18 10    well, for one, cash payments generally stopped being made after

11    2018 and 2019, so we're going to take those out.

12            In addition -- and I want to correct something that

13    the government has said here as to what was --

14            THE COURT:  Wait, why would we be taking those out?

15            MS. PASCUCCI:  Well, your Honor --

16            THE COURT:  I mean -- meaning, isn't the scheme

17    charged here '16 through '22?

18            MS. PASCUCCI:  Your Honor, there were still checks

19    that were being made under the table to laborers after 2018 and

11:18 20    2019, and we have not taken out those checks.

21            THE COURT:  Okay.

22            MS. PASCUCCI:  What we are seeking to remove is the

23    cash payments.

24            And so we said we're going to take out this category

25    because we don't believe that this category of checks are for

       1    cash, not checks that are being given directly to laborers, but
       2    cash shouldn't be included.
       3            In addition, as we look through the Excel spreadsheet,
       4    we saw that the cash --
       5            THE COURT:  I'm sorry, counsel, why shouldn't those be
       6    included?
       7            MS. PASCUCCI:  So, your Honor, cash generally -- there
       8    stopped being payments to bricklayers in cash after 2018 and
       9    2019.
11:19 10            (Pause.)
      11            THE COURT:  Okay.
      12            MS. PASCUCCI:  And as we --
      13            THE COURT:  So the cash payments that you're taking
      14    out are for what period of time?
      15            MS. PASCUCCI:  It would be from 2018 forward.
      16            THE COURT:  I guess I'm losing something here.
      17            So, meaning, there's -- what is the basis to say there
      18    stopped being cash payments to bricklayers?
      19            MS. PASCUCCI:  Your Honor, as we understand it, the
11:20 20    bricklayers were asking for higher and higher hourly rates, and
      21    it ended up, ultimately, being very costly to make these cash
      22    payments, so they eventually put a stop to doing the cash
      23    payments in 2018 and 2019.
      24            THE COURT:  Okay.
      25            Counsel.

1      MS. PASCUCCI:  And there were other categories in

2 there as well that we removed, and this isn't the cash

3 payments.  Again -- and just to clarify, your Honor, this is

4 two groups of payments, the payments to the laborers are

5 checks, the payments to the bricklayers are cash.  So we're

6 just talking about the scope that is cash right now.

7      And then there are other categories of payments in

8 there that we removed as well, and that includes payments that

9 occurred during the winter months.

11:20 10      Now, to respond to something Ms. Kaplan said where we

11 said work did not happen in the winter, I want to correct that.

12 We did not say work did not happen in winter, but work was much

13 less in winter.  And if you actually go through these payments,

14 the payments that are made in winter are the same as the

15 payments that are made in spring and summer.  And that simply

16 should not be the case, because in winter there is much less

17 construction because bad weather can really affect jobs.

18      So seeing this, again, there's nothing on the face of

19 these checks that says this is part of the program and this is

11:21 20 not.

21      And given that what we have to do is make a reasonable

22 estimate and given that there seem to be --

23      THE COURT:  I think I understand your point.

24      MS. PASCUCCI:  Yes.

25      THE COURT:  Meaning that the cash or the checks for

1     cash are sort of unassigned --

2               MS. PASCUCCI:  Yes.

3               THE COURT:  -- for the purposes of whether or not

4     they're in -- they're part of this Flowers unlawful scheme.

5               MS. PASCUCCI:  Exactly, your Honor.

6               THE COURT:  Okay.

7               MS. PASCUCCI:  And in addition, what's helpful here to

8     know is that there are plenty of valid reason to have office

9     staff cash.

11:22 10          For example, for paying -- for paying for landscaping

11    supplies, for paying for machine supplies, for paying for

12    kitchen supplies.  So there were plenty of reasons to have

13    checks like this that were valid that weren't part of the

14    scheme.

15          And then, she also says that we exclude non-p checks

16    under $2,000.  Again, the -- what we are excluding that's under

17    $2,000 is the office staff checks -- the office staff cashed

18    checks.  And what we're saying is when they were taking out

19    cash for paying the laborers or for paying bricklayers, they

11:22 20     were taking out larger sums because they would be paying

21    multiple employees at a time.

22          So under $2,000, we think that that was more likely

23    for supplies.

24          And they point to a few instances where there are

25    non-p checks, and it's our understanding that those checks are

1  checks that are being paid directly to employees that are under

2  $2,000, but that's different because those are checks that are

3  made to individual employees.  Whereas when we're talking about

4  this office staff cash category, that's talking about payment

5  to multiple employees at the same time.

6          THE COURT:  So those are a category that is not

7  included in your calculation of the loss amount.

8          MS. PASCUCCI:  Exactly.  And that brings us to a loss

9  to the laborers of approximately $455,000, and a loss to the

11:23 10  bricklayers of $112,000, which brings us a total to the benefit

11  funds of about $568,000.

12          THE COURT:  And so if I'm understanding what you just

13  said, they were objections really to calculation as to the

14  bricklayers as to opposed to laborers, but the numbers -- the

15  loss amount numbers calculated by the defense is close to half

16  of what it is calculated by the government.  So what's the

17  reason for that difference?

18          MS. PASCUCCI:  Yes, your Honor.

19          So when we objected to the PSR and said these office

11:24 20  staff cash payments from after 2018, 2019 shouldn't be included

21  in the loss, the government's reaction was to say, Okay, well,

22  in that case we are going to put these into the laborers'

23  bucket and say that that loss is to the laborers instead.  But

24  we really don't think that that's how this should be addressed.

25          They categorize these as loss to the bricklayers.

 1    It's either loss to the bricklayers or not part of the loss,

 2    and I don't think the government can simply change the position

 3    of who this loss is attributable to so that it can include that

 4    loss in its sum when we've raised a valid defense to why we

 5    don't think that loss should be included from the get-go.

 6          THE COURT:  And in your estimation, the $455,000

 7    number is -- represents what?

 8          MS. PASCUCCI:  That would be the loss to the laborers'

 9    funds.

11:25 10        THE COURT:  No, but, meaning, is that just the checks?

11          MS. PASCUCCI:  That is the checks, yes, your Honor.

12          THE COURT:  As clearly identified as to the laborers?

13          MS. PASCUCCI:  Yes.

14          THE COURT:  As opposed to the 823?

15          MS. PASCUCCI:  Yes, yes.

16          Because if the government's -- if you look at the

17    left-hand side column here of the 823 --

18          THE COURT:  Yes.

19          MS. PASCUCCI:  -- that is a combination of checks and

11:25 20   cash.  And the difference between our figure and the

21    government's figure is our figure does not include cash for

22    laborers.

23          So the cash that is in the government's laborers'

24    bucket is cash that had formerly been categorized as bricklayer

25    losses and has now been brought over to laborers' losses.

1         THE COURT:  Right.  But, I guess -- I understand the

2    point that the Court needs to come to a reasonable basis,

3    right, for calculating loss.  What's not to say, though, that

4    your subtraction isn't overinclusive, right?

5         So in terms of these cash payments that you excluded,

6    like, what is the process by which you -- other than sort of

7    taking it by category, what is the process by which you say

8    that taking out the cash payments is a more reasonable

9    calculation?

11:26 10       MS. PASCUCCI:  So for -- our understanding is that the

11   way that the scheme worked is that laborers were generally paid

12   by checks and that bricklayers were generally paid by cash.

13   And we don't think this is just transmutable, that you can just

14   say, Okay, well, laborers -- well, bricklayers weren't paid by

15   cash after 2018, therefore, laborers were.

16        And particularly, because there's nothing on the face

17   of these office staff cash checks that says, hey, this is part

18   of the scheme.  The only way to look is look at general

19   categories of checks and what should really go in and really go

11:27 20   out.

21        And we think that the way the government does this is

22   way overinclusive, and I think this actually speaks to a

23   general way that the scheme worked and why we think this lower

24   number is accurate.

25        This was not a scheme whereby every laborer and every

1  bricklayer was paid this way.  This was a scheme for overtime

2  on weekends, and this is actually outlined in some of our

3  attachments.  We included two MOIs that were produced to us by

4  the government and they very nicely, like, kind of describe the

5  company would choose individuals who would be paid these

6  ways -- this way.  They'd approach individuals about whether

7  they wanted to be paid this way for overtime on weekends, and

8  those individuals would be paid that way.

9        This is not a scheme where we're talking about

11:28 10  hundreds of individuals.  And in fact, by the time the scheme

11  ended, we were really only talking about 12 to 15 people, and

12  for that reason we think this $1 million figure is much too

13  high and that our figure of $568,000 reflects the way the

14  scheme actually operated at the company.

15        THE COURT:  Thank you.

16        Ms. Kaplan, I'll let you briefly respond, and then we

17  can turn to the tax loss.

18        MS. KAPLAN:  I will just briefly respond, your Honor.

19        I guess I would pose a question:  Why would the

11:28 20  defendant have put any notations on checks as to what that

21  money was for?

22        This is a scheme involving concealment where that's

23  exactly what he did, he falsified the remittance reports; he

24  had this Flowers program where he handpicked people, members of

25  the union, to be part of this program; and not -- I think she

1     said 12 people, it was 66 individual union members.

2             THE COURT:  I understand the point, but what about --

3             MS. KAPLAN:  So what I will say --

4             THE COURT:  Well, I guess what I'm asking is but were

5     there other -- does the government have evidence that there

6     were other payments being made in cash that were not part of

7     this scheme for the purposes of other expenses?

8             MS. KAPLAN:  No, no, and that's what I would say, your

9     Honor.

11:29 10          Your Honor, if you recall, you ordered the government

11    to turn over the ROIs involving this issue, and I did that, and

12    I'm happy to provide those to your Honor.

13          I think we put -- we spoke to 25 to 50 individual

14    former and current employees of NER, including union members,

15    accountants, controllers, consultants that were hired by the

16    defendant, and we went through check by check.  And all of

17    these checks that are written out to these NEM, the management

18    company, employees, these individual witnesses told us that

19    that was part of the scheme and that they were told by the

11:30 20   defendant to take the check and go to the bank and that that

21    was the Flowers money, and that's our evidence.  And I'm happy

22    to provide those ROIs to the Court.

23            THE COURT:  And that is just on the laborers or are we

24    just talking about the bricklayers?

25            MS. KAPLAN:  Both, your Honor.

```
 1              THE COURT:  Okay.
 2              There would have been no reason -- just briefly, your
 3     Honor.
 4              THE COURT:  Sure.
 5              MS. KAPLAN:  There would have been no reason for an
 6     assistant controller to be taking -- you know, be issued a
 7     check in the amount of $8,000 and go to the bank.  The only
 8     reason would be to pay the union members who were participating
 9     in the Flowers program.
11:31 10          THE COURT:  And what do you say to the argument about
11     the difference between the government's loss amounts
12     attributable to the laborers versus the defense's, the 823
13     versus the 455?
14              MS. KAPLAN:  Well, we did put back the money that the
15     defendant said cash was not paid to the bricklayers as of 2018,
16     so we did take that money and we put that into the bucket for
17     the laborers.  But I would point out that even in the letter
18     from the executive director of the Mass. Laborers' Benefit
19     Funds, they did an analysis and arrived at a number shortfall
11:31 20     of benefit contributions of $777,602, so much closer to the
21     government's number --
22              THE COURT:  Is that the January 17th letter?
23              MS. KAPLAN:  Yes.
24              THE COURT:  Okay.
25              I'm sorry, where were you pointing me?
```

```
 1              MS. KAPLAN:  So they do a different analysis.  They go
 2       about the calculation in a different way, but they come out
 3       quite close to where the government came out on.
 4              THE COURT:  On the last page, counsel?
 5              MS. KAPLAN:  I'm sorry?
 6              THE COURT:  On the last page?
 7              MS. KAPLAN:  I think it's on -- the pages aren't
 8       numbered, but it's the third-to-last page.  The third page at
 9       the bottom of the page, towards the bottom of the page.
11:32 10        The audit showed -- the paragraph starts, In the end,
11       the audit showed --
12              THE COURT:  Yes, I see it.
13              (Pause.)
14              THE COURT:  Yeah, I think that's the same number
15       that's on the last page.
16              MS. KAPLAN:  Oh, okay.
17              (Pause.)
18              MS. KAPLAN:  Yes, you're right, I apologize.  Yes.
19              Shall I address Count Two?
11:33 20        THE COURT:  Or Count Ten.
21              MS. KAPLAN:  Count Ten, sorry.
22              THE COURT:  Yes.
23              MS. KAPLAN:  Okay.
24              With respect to the base offense level for Count Ten,
25       the total tax loss is $3,842,680, which carries a base offense
```

level of 24.

As to that $3.8 million figure -- if I could just shorten it to $3.8 million -- if I couldn't just shorten it to 3.8 --

THE COURT:  Sure.

MS. KAPLAN:  -- as to that $3.8 million figure, there is $210,570 owed to the Mass. Department of Revenue.  And, as explained in further detail in paragraph 9 of the affidavit of Internal Revenue Agent Colleen Ranahan, which was attached to the government's sentencing memo, that figure is further decreased, not double-counted, that was decreased to $3,035,648 because of the application by the IRS in November of 2023, this past November, of a $596,452 employee tax credit to NER's tax liability, and that amount should now go as restitution to NER or NEM.

The defendant is trying to reduce the tax loss amount by attempting to narrow the scope of the indictment and what defendant pled guilty to, which the government submits is coming dangerously close to him not accepting responsibility.

This is not just a case about the defendant's failure to properly account for overtime hours for purposes of paying fringe benefits and payroll taxes, the indictment includes allegations about the tax treatment of certain expenses, and I would direct the Court's attention to paragraphs 19 and 20 of the indictment.

1          THE COURT:  I have that here, counsel.

2          MS. KAPLAN:  Okay.

3          And the loss amount calculated by the government for

4     Count Ten does not even include the failure of the defendant to

5     pay his employees at the collectively bargained for overtime

6     rate.  And not because we don't know what that number is, we

7     do, and it's in the affidavit of Christian Ruehrwein from the

8     Department of Labor.  It wasn't included because the number was

9     already so high and we had so much else that we knew would be

11:35 10    included as relevant conduct.

11         For the loss amount, the government's figure also does

12    not include the personal expenses not accounted for in

13    defendant's taxes.

14         The indictment did not include this number because the

15    defendant said from the outset of this investigation that he

16    was going to plead guilty, and we had conversations about the

17    government holding off on superseding to add that number and we

18    held off in an attempt to resolve the case.

19         The defendant also wants the Court to reduce the loss

11:35 20    amount arguing that defendant made a mistake believing that the

21    PPP loan acted to defer payment of the filed 941 payroll taxes.

22    It did not.  The PPP loan has nothing whatsoever to do with the

23    deferment of taxes, as explained in the affidavit of IRS

24    Special Agent Colleen Ranahan.

25         Moreover, there are witnesses -- defendant's own

1    accountants and consultants -- who told the defendant that it

2    was a huge mistake not to pay these taxes, yet, defendant chose

3    to ignore that advice.

4         Your Honor, the letter, January 17th letter from

5    Nathan Goldstein, the Executive Director of the Mass. Laborers'

6    Benefit Funds, tells the story of the defendant who defaulted

7    several times on payment of contributions to the benefit funds

8    before this investigation, and he had to be sued by the benefit

9    funds in order for them to collect these contributions.  This

11:36 10   is all evidence of someone who was avoiding his obligations to

11   the benefit funds and to the IRS for the purpose of personally

12   enriching himself.  He acted intentionally and not by mistake.

13        And I'm happy to answer specific questions your Honor

14   has about the tax loss for Count Ten.

15        THE COURT:  Thank you.

16        Counsel, I'll hear from you.

17        MS. PASCUCCI:  Your Honor, could I just address one

18   rebuttal point on Count One before I move to Count Ten?

19        THE COURT:  You can.

11:37 20   MS. PASCUCCI:  I want to just address the letter on

21   behalf of the laborers and the figure of -- I believe it's

22   approximately 770k.  Only 582k of that was actually audited

23   loss.  And I just want to raise that and make sure that's clear

24   with the Court.

25        And I won't revisit everything in Count One, but just

         1   to say we did note that there were many valid reasons for there

         2   to be office staff cash checks.

         3            But I will go ahead and move to Count Ten.

         4            We think that the loss in Count Ten --

         5            THE COURT:  Meaning that the 770 is overinclusive, in

         6   your view?

         7            MS. PASCUCCI:  Yes, it is, your Honor.

         8            THE COURT:  Okay.

         9            Okay.

11:37   10            Counsel, Count Ten.

        11            MS. PASCUCCI:  Thank you, your Honor.

        12            We believe, much like Count One, Count Ten is

        13   overinclusive and that it is lumping in categories of payments

        14   that should not be considered loss in this case.

        15            Before I delve into the actual calculation, I want to

        16   point your Honor to the Rule 11 transcript in this case, and I

        17   heard this today and I saw it in the government's sentencing

        18   memo of the -- of, you know, the defendant pleaded guilty to

        19   all this conduct.  And I want to be really clear about what was

11:38   20   said at the Rule 11 hearing, because this was very deliberate,

        21   your Honor.

        22            He pleaded guilty to the essential elements of the

        23   crimes, not to all the facts that the government recited, and

        24   we made astoundingly clear that we were very different as to

        25   loss in this case.

    1           But to turn --
    2           THE COURT:  And my memory is in your plea agreement
    3     you weren't in the same place about the calculations.
    4           MS. PASCUCCI:  Exactly, your Honor.
    5           THE COURT:  Understood.
    6           MS. PASCUCCI:  Thank you.
    7           So I want to take the categories of tax in two general
    8     buckets, and the first is this $2 million of deferred taxes.
    9           And again, your Honor, we view this scheme as a scheme
11:39 10     to make under-the-table payments to union workers.  That is
   11     what Mr. LoConte pleaded guilty to.
   12           THE COURT:  But he also pled guilty to Count Ten,
   13     right, which is separately about tax payments?
   14           MS. PASCUCCI:  Count Ten is about tax payments, but
   15     that is the under-the-table payment to workers.
   16           And with respect to deferred taxes, this has to do
   17     with properly reported yet deferred taxes.  This isn't a
   18     criminal issue, your Honor.  This is a civil --
   19           THE COURT:  Counsel, I'm just going to stop you so I
11:39 20     understand the point you just made.
   21           Because as I read -- I have the indictment in front of
   22     me.  Trust fund payments imposed on employees of NER and NEM,
   23     did willfully fail to collect, truthfully account for and pay
   24     over such taxes due and owing to the United States.
   25           So I take it you're not disputing that or --

```
 1              MS. PASCUCCI:  We are not disputing that, but we view
 2      that as applying to the under-the-table payments to workers,
 3      your Honor, and not to this general category --
 4              THE COURT:  So to all of the off-of-the-books
 5      payments, whether they were cash or they were checks.
 6              MS. PASCUCCI:  Yes, your Honor.
 7              THE COURT:  And -- okay.
 8              All the taxes -- all the taxes that were due to the
 9      IRS and not collected and paid.
11:40 10         MS. PASCUCCI:  Yes, your Honor.  And this is
11      specifically the $2 million figure that is properly reported
12      yet deferred taxes.
13              THE COURT:  And what period of time was that?
14              MS. PASCUCCI:  Your Honor, our understanding, this is
15      for 2020 to 2022.  2021 --
16              THE COURT:  This is for COVID deferral, you mean?
17              MS. PASCUCCI:  Yes.
18              THE COURT:  Okay.
19              Counsel, you can continue.
11:41 20         MS. PASCUCCI:  Thank you, your Honor.
21              The government has referenced affidavits it submitted
22      about the proper method for deferring taxes.  And, your Honor,
23      we believe that the proper question here is not to what the
24      exact proper method is, but what Mr. LoConte's understanding
25      is.
```

1        When you're looking at the tax law, something is only

2   criminal when it's intent and willfulness, and we don't think

3   we've seen any evidence that he had knowledge and intent with

4   respect to this $2 million deferral.  To the contrary, with our

5   sentencing memo, we submitted a financial statement that shows

6   NER receiving a $1.9 million ERC, employment retention credit.

7        It is entirely possible that Mr. LoConte and his

8   accountant could have misunderstood the procedure or got the

9   procedure wrong, but that's simply beside the point about

11:42  10   whether that's -- that included in a criminal tax loss.

11       And, your Honor, I'll also note that this $2 million

12   doubles the figure of the tax loss.  Meaning that in a scheme

13   that's generally about how workers were paid, over half the

14   loss is coming from properly reported yet deferred taxes.

15       Now, the government says that they have -- they talk

16   about that many people warned him about deferred taxes.  I do

17   not know where this is coming from.  They do cite an email from

18   a Mr. Ciampa as -- where there's a reference to deferred taxes,

19   but you'll note the that the entire email is not submitted to

11:43  20   the Court, and this is a much longer email that simply had

21   nothing to do with application for ERC -- for an employment --

22   for ERC.  And we do not think that that should be construed as

23   somehow showing his intent or knowledge.

24       If I may, your Honor, I can return to the other -- I

25   can then turn to the other bucket of tax loss here.

1         THE COURT:  Sure.

2         MS. PASCUCCI:  And this is NER and NEM tax loss from

3 vendor payments and vehicle expenses.  And this is particularly

4 looking at the Ranahan affidavit, which we offer our own

5 calculation on page 13 of our sentencing memo.

6         The government says that because there are some

7 instances where payments were made to employees through vehicle

8 expenses or on vendor reports to avoid taxes, every instance of

9 such a payment is part of the fraud.  But, your Honor, I don't

11:44 10 think that government can take some instances of this and then

11 say every such instance the vehicle expense in a vendor report

12 payment to an employee is part of the fraud.  And we think this

13 is vastly overestimating and not a reasonable estimate of the

14 loss for purposes of the tax figure.

15         And I want to note how these documents appear, and in

16 particular, the vendor reports that we received.

17         Whereas for the benefit funds, we have a check by

18 check and payment by payment Excel spreadsheet that allows us

19 to say this is what goes in, this is what goes out.  The vendor

11:44 20 reports that we got from the government don't have that type of

21 this goes in, this goes out.

22         We have hundreds of pages of vendor reports and there

23 is no indication on the vendor reports themselves of what

24 payments the government is putting into this loss category,

25 which makes it really difficult for us to go through and say

1   this loss shouldn't be included.

2          What we did for purposes of our calculation is that

3   there are two entities at issue here, NER, from which union

4   workers were paid, and NEM, through which more management

5   employees were paid.

6          NER is, again, union payments.  We removed the NER

7   component of loss and we tried to back out what we would view

8   as the tax loss coming from the bricklayers' payments that were

9   no longer included in the fraud, and that brought us to a loss,

11:45 10   a tax loss of around $800,000 for the IRS.

11          THE COURT:  That's the 807 figure?

12          MS. PASCUCCI:  Yes, and that would be IRS and the

13   Mass. Department of Revenue.

14          THE COURT:  Because of the removal of the NEM from

15   both of those buckets?

16          MS. PASCUCCI:  Yes.

17          And, your Honor, I'll add that that is also us

18   reducing the FICA calculation, and that is the federal income

19   tax where half is paid by the employer and half is paid by the

11:46 20   employee.

21          We also reduced that by half from 15.3 percent to

22   about 7.2 percent, and I may have the decimal wrong there, but

23   that's approximately it.

24          And again, there is an employee and an employer

25   contribution.  We think that Mr. LoConte can fairly be said

1   that his loss comprises the employer contribution, but nothing

2   stopped the employees from reporting this on their IRS and we

3   do not think that he should be held for the employee

4   contribution.

5        So our tax loss with the 7 percent calculation and

6   backing out the NEM figure and the bricklayers brings us to

7   800k, approximately.

8        THE COURT:  Okay.

9        And what about the 596,000 that is included in the

11:47 10  government's calculation?

11        MS. PASCUCCI:  Your Honor, it's our understanding that

12   that $596,000 goes to the deferred tax issue, and for that

13   reason we would object to that.

14        THE COURT:  Thank you.

15        Ms. Kaplan, if you want to respond.

16        MS. KAPLAN:  Yes, your Honor.

17        Okay.

18        So I think we're dealing in semantics here when

19   defense counsel is arguing about deferred taxes.  I don't know

11:47 20  where that comes from.  There were no taxes that were deferred.

21        Defendant filed the 941s.  He was obligated to pay

22   them.  He did not ask, seek a deferment.  So I think what

23   they're saying is that he chose to defer those taxes, $2

24   million, was the filed 941s that were not paid, and he's

25   referring to them as deferred because he decided to defer them.

1   There was no deferment by the IRS, and I believe that that's

2   gone into in the affidavit of Colleen Ranahan.

3       The argument that Mr. LoConte may have misunderstood

4   this deferment, there's no proof of that.  The defendant

5   submitted no affidavit.  There's no accountant, consultant who

6   said that they had conversations with Mr. LoConte about this.

7   There's simply no evidence of it.

8       And, your Honor, I would -- I do happen to have the

9   email from Michael Ciampa dated April 21st of 2020 to Frank

11:49 10  LoConte, and the -- Joanna Picardi, who was the controller at

11  the time, is copied.  And I'm happy to hand it up to the Court.

12  But it's all about Mr. Ciampa, who was the consultant hired by

13  the defendant, telling him that the worst -- the practice of

14  deferring payments of past due withholding taxes is the worst

15  sin you or the company can do regarding protecting the rights

16  of your secured creditor and it also puts at risk my personal

17  reputation.

18      The entire email is about this.  And I'm happy to hand

19  it to the Court.  The defendant has it.  We received this email

11:49 20  from NER.

21      THE COURT:  And, counsel, your sister and brother have

22  it already?

23      MS. KAPLAN:  Yes.

24      THE COURT:  Okay.

25      I'll take it.

1          (Pause.)

2          THE COURT:  Thank you.

3          MS. KAPLAN:  With respect to the -- well, let's go

4    back to the indictment for a second.

5          The indictment, the general allegations in paragraph

6    19, it says that LoConte caused NEM to pay more than $1.7

7    million to certain NEM employees in bonuses and vehicle

8    expenses that were not properly accounted for in NEM's payroll

9    records resulting in no taxes being withheld.  That is part of

11:50 10   this indictment.

11          Paragraph 20 of the indictment goes on to say, LoConte

12   directed and assigned office employees to prepare and file IRS

13   Forms 941 for tax years 2016 through 2021 on behalf of NER and

14   NEM; however, LoConte deliberately failed to report to the IRS

15   the off-the-books wages, bonuses, and vehicle expenses he

16   caused to be paid to NER and NEM employees as required.

17          So to now be up here and say that this is not part of

18   the case, you have to remove all the payments, the tax loss for

19   payments to NEM employees, is just -- there's no support for

11:51 20   that.

21          THE COURT:  Counsel, I may have missed it.

22          I took the argument to be not that the vehicle

23   expenses weren't a vehicle to execute the scheme, but the

24   inclusion of all of the vehicle expenses were overstating the

25   loss attributable to the scheme.  So how did the government go

1    about identifying which were which?

2         MS. KAPLAN:  We interviewed each and every single

3    witness who received a vehicle expense or a bonus and each and

4    every assistant controller and controller that either was still

5    working for NER -- NEM or had done so in the past, and that's

6    how we arrived -- we sat with them.

7         In fact, we sat with the former controller of NER who

8    is now submitting a letter of support on behalf of Mr. LoConte

9    who went through every single one of those vendor expenses and

11:51 10   told us, and told us under oath, that these were vehicle

11   expenses for raises and bonuses that were not taxed and should

12   have been, and that she, in fact, had prepared 1099s because

13   she believed they should have been taxed.  And the defendant

14   told her to pull back the 1099s and refused to allow 1099s to

15   be filed because he had no intention of paying taxes on that

16   money, and that's part of this indictment.

17         THE COURT:  Thank you.

18         MS. KAPLAN:  With respect to the employee retention

19   credit of the $596,000, my understanding of what happened with

11:52 20   that -- that is in the affidavit of Colleen Ranahan from the

21   IRS -- is that at some point NER filed for employee retention

22   tax credit -- and I'm no tax attorney, your Honor, so I hope I

23   have this right, but this is how it was explained to me.

24         They filed for this tax credit.  There was a certain

25   period of time -- and it was during COVID, or it was as a

1     result of COVID, the inability to make payroll -- and the IRS

2     took some time in going through it.  And the civil division of

3     the IRS, without checking with the criminal division of the

4     IRS, decided to grant that tax credit but saw that there was a

5     tax liability for NER on their books, and so they took that

6     money and they credited it towards the tax liability, a tax

7     liability that the government submits is defendant's

8     responsibility because he was the person responsible for

9     payment of these taxes.

11:53 10          So that's why the government is taking the $596,000,

11    removed it from money that's owed to the IRS because it would

12    give that money back to the IRS, it's a windfall for the IRS,

13    but it is owed now to NER because they are essentially the

14    provider of compensation under 18 USC 3664(j)(1), I believe it

15    is, your Honor.

16          THE COURT:  So, Ms. Kaplan, I think I was following

17    that, but as I understand it, it would -- it was tax liability

18    that NER was on the hook for, they applied for credit, a tax

19    credit from the IRS, which was granted, but the liability would

11:54 20    be part of the scheme, Mr. LoConte's scheme charged here.

21          MS. KAPLAN:  Correct.

22          THE COURT:  Thank you.

23          Counsel, did you want to be heard on that last point

24    or I think you'd --

25          MS. PASCUCCI:  Your Honor, I'll note that -- two

```
 1    points here on Count Ten.

 2           First, I want to just note the government says that we

 3    haven't showed any evidence.  That's not the burden at

 4    sentencing.

 5           THE COURT:  Understood.

 6           MS. PASCUCCI:  The burden is on the government to

 7    prove loss.

 8           And then the vehicle expenses and vendor expenses,

 9    your Honor, we object to every vehicle expense was wrongful.

11:55 10        Yes, there were vehicle expenses that were part of the

11    fraud, but we do not believe that every single person that got

12    a vehicle expense would have been interviewed and would have

13    said that this was part of the fraud, so I'll just respond to

14    those two points.

15           THE COURT:  Okay.

16           MS. KAPLAN:  Your Honor, if I might.  I just want to

17    correct -- I didn't mean to suggest that every single vehicle

18    expense was not a legitimate vehicle expense.  There were some,

19    but those are the ones that were counted, the ones we were able

11:55 20    to confirm that they were given a vehicle expenses as part of

21    their job because they needed to commute -- I mean they needed

22    it for working in the field.  We took that -- we didn't include

23    that as part of the loss amount.

24           THE COURT:  Okay.

25           Counsel, I obviously want to give more thought to your
```

         1    objections as to loss amount.

         2           I think there was also an objection to the abuse of

         3    trust; am I remembering that correctly?

         4           MS. PASCUCCI:  Yes, your Honor.

         5           THE COURT:  I think -- why don't I turn to you.  I

         6    think I have a sense of the government's basis for that, and I

         7    think Probation took the same position in terms of applying

         8    abuse of trust, if I'm recalling.

         9           PROBATION OFFICER:  That's correct, your Honor.

11:56   10           THE COURT:  So why don't I hear from the defense and

        11    then I'll let the government respond.

        12           MS. PASCUCCI:  Yes, your Honor.

        13           With abuse of a position of trust, it's important to

        14    think of abuse of position of trust vis-a-vis the victim in the

        15    case, and the victims in this case, the victims that have loss

        16    going to them, are the benefit funds and the IRS.  And we cite

        17    three cases, Circuit Court of Appeal cases from the last decade

        18    that say when you're looking at cases that have to do with

        19    reporting of payments to the government, the defendant does not

11:57   20    hold a position of trust with respect to the government.

        21           And in this case, his position with respect to the

        22    benefit funds is exactly the same position that he holds with

        23    respect to the government.  In other words, it's a reporting

        24    position.  It's not a report -- it's not a position where he

        25    holds a position of trust within the benefit funds.

1          And if we took this analysis that whenever someone

2     trusts you to report something correctly, it's abuse of a

3     position of trust, literally every bank fraud case that comes

4     before this Court would be a case involving an abuse of trust

5     enhancement.

6          If you go through the government's analysis of the

7     abuse of position of trust, it looks at his role vis-a-vis the

8     other NER shareholders versus the workers and versus other NER

9     employees.  Your Honor, those aren't the victims in this case.

11:58 10          And the court follows this two-step analysis from a

11     1st Circuit case, United States v. Roman.  And that case, your

12     Honor, it simply is not applicable here.  That had to do with a

13     case -- with a situation where a defendant held a position of

14     trust within a company and due to the position of trust within

15     the company, that led to the crime that was committed there and

16     their having relied on her.

17          And that's the difference here, your Honor.  The

18     question is what is his relationship to the victims, the

19     government and the benefit funds, and we do not believe abuse

11:58 20     of trust apply to that.

21          THE COURT:  And why wouldn't it apply to the benefit

22     funds?

23          MS. PASCUCCI:  Your Honor, his relationship with

24     respect to the benefit funds is simply a reporting

25     relationship, sending the remittance reports.  And at the point

 1  where we're saying remittance of -- sending a remittance report

 2  creates a position of trust, that essentially makes every fraud

 3  case where there's some type of conveyance where this is how

 4  much something was or this is reporting of a figure into an

 5  abuse of trust case.

 6       THE COURT:  Thank you.

 7       Ms. Kaplan.

 8       MS. KAPLAN:  Just briefly, your Honor.

 9       The government submits that with respect to the IRS,

11:59 10  there is no abuse of position of trust.  However, they are a

11  victim in this case, but I don't believe there is an abuse of

12  trust with respect to the IRS.

13       But there are other victims, and that the other

14  victims are NER, the company; the employees who were shorted

15  their money, whose fringe benefits were not made on their

16  behalf; as well as the Sylvester Trust, who was the 60

17  percent -- at the time was a 60 percent owner of NER, and the

18  defendant was entrusted to properly manage and account for and

19  pay all the payroll obligations and the tax obligations that

12:00 20  were owed by the company.  He was the sole trustee of that

21  trust and 40 percent owner of the company.

22       THE COURT:  What do you say to the caselaw that your

23  sister is citing about it being viewed through the lens of who

24  the victims were vis-a-vis the reporting position to the

25  benefit funds?

1    MS. KAPLAN:  I'm not sure I've read those cases, your

2  Honor.

3    I will say this, that I think that the analysis is a

4  little bit more complicated with respect to the benefit funds

5  because -- but I think that the analysis is really who is the

6  owner of the assets.  And there was a collective bargaining

7  agreement between NER and the benefit funds, but the

8  contributions hadn't yet been made.  So I think there may be an

9  issue -- I haven't read the defendant's -- the cases that

12:01 10  they've cited, but I think that analysis is more complicated,

11  so I'm pushing forward on the victims being NER, the company

12  employees, and the Sylvester Trust for the abuse of trust.

13    THE COURT:  Thank you.

14    Counsel, I think those were the disputed issues as to

15  the guideline calculations, unless I've missed something else.

16    MS. PASCUCCI:  Your Honor, there's also a dispute as

17  to grouping.

18    THE COURT:  Oh, yes.  Counsel, I'll hear you on that.

19    I know here Probation treated them as separate groups

12:01 20  based on, I believe, separate victims, if I'm recalling the

21  commentary.

22    PROBATION OFFICER:  That's correct, your Honor.

23    THE COURT:  Okay.

24    Counsel, I'll hear you.

25    MS. PASCUCCI:  Thank you, your Honor.

1          I want to direct you to 3D1.2(d), and I think that

2    is --

3          THE COURT:  Counsel, I can't hear you.

4          MS. PASCUCCI:  It is 3D1.2(d).

5          And this instructs that -- or do you want to pull it

6    up first?  I see you have the guidelines in front of you, your

7    Honor.

8          THE COURT:  Yeah, give me a second.

9          (Pause.)

12:02 10         THE COURT:  I'm there, counsel.

11         MS. PASCUCCI:  Thank you.

12         When we are looking at an offense level based on total

13   loss, guidelines under 2B1 and 2T1, which are the operative

14   guidelines here, tend to be grouped.

15         And if you look closely -- if you look through the

16   language and guidance of 3D1.2, it's not just whether it's the

17   same victim, but whether it's the same type of harm.

18         And if you go a few pages forward, I believe it's

19   just -- yes, it's on page 370, I would direct you to Note 6,

12:03 20  the examples.  And they said that, Example 2, where defendant

21   is convicted of two counts of theft of Social Security checks

22   and three counts of theft from the mail, each from a different

23   victim, all five counts are to be grouped together.

24         And the general takeaway from 3D1.2(d) and the 3D1

25   section entirely, is we're looking at the type of harm.  And in

        1    this case, this is all based on the same scheme and the same

        2    type of harm.  And we think this guidance is determinative in

        3    saying that these should be grouped, your Honor.

        4            THE COURT:  And what is the practical effect of that?

        5    Is it just -- my memory is there was -- putting aside the

        6    parties' differences about loss amount, I think the grouping

        7    here because the loss amount -- the offense calculation for the

        8    two groups wasn't so for apart, right?  We're at 23 and 24, so

        9    I think that meant it was increased by 2 units.

12:04  10            MS. PASCUCCI:  Yes, your Honor.  I think if -- I think

       11    if it's not grouped, it's an increase by two; and if it is

       12    grouped, it's only increased by one because the group is

       13    assigned a single unit.  I believe that's correct.

       14            THE COURT:  Is that -- Probation, Mr. Mills?

       15            PROBATION OFFICER:  I think so.

       16            Also, just if I can just comment real quick on the

       17    3D1.2(d).  There's an inclusive list and there's an exclusive

       18    list.  And just because of the two guidelines are actually

       19    listed 2D or 2B or 2T are listed in the included list, it

12:05  20    doesn't mean they automatically group together, it's the same

       21    guidelines.

       22            So, say, for instance, if multiple counts of drugs,

       23    all 2D, then we would group them all together.

       24            But with respect when you're talking about victim, 2D

       25    does take into the aggregate harm, meaning that the total

1    amount of harm if it's the same victim.  And we can kind of

2    extrapolate from the guidelines being that if we look at the

3    other roles under (a), (b), and (c), working backwards, (c) we

4    can group the counts if one of the counts takes into a specific

5    offense characteristics of one of the others, which is not the

6    case in this case; and under (a) and (b) speaks directly to

7    victims.  And you'll notice that under both (a) and (b) it says

8    if it's the same victim and --

9              THE COURT:  The same act or transaction.

12:05 10              PROBATION OFFICER:  Right, one transaction, or under

11    (b), the same victim or multiple transactions.

12              So, in this case, let's say, for instance, there was

13    the one victim, which is the entity NER, multiple transactions.

14    We could see grouping it because there's actually one victim.

15              But the reason we separate them out, and I guess the

16    way we separated them out in Count One and Count Ten is we

17    believe the government, the IRS, is a victim, but also the

18    actually entity is the victim.

19              The best way I can explain this, if we were to use

12:06 20    physical violence, we can account for the amount of physical

21    harm to one person may not be the same amount of physical harm

22    applied to another.  So one can actually get serious bodily

23    injury while another one could get, you know, permanent,

24    life-threatening.  So we have to take the two victims

25    separately so we can account for that total harm.  So that's

1    why we separated them out.

2          And with regard to grouping, so when it does happen

3    that way to where we can only use one guideline, so when it

4    comes to grouping, how do we take into account the two groups?

5    And that's where the levels come in saying, well, anything from

6    one to four levels, we're going to assign it a unit; anything

7    from 5 to 8 levels difference, which the guidelines are

8    explicitly saying we think is not as serious, the two offenses

9    aren't as serious as one other, so we're going to give five or

12:07 10   eight levels, we're only going to assign half a unit.  And then

11   the guidelines say anything that the guidelines -- the offenses

12   are so far apart, nine levels and higher, we're not going to

13   assign it any units.

14         So by applying one or two units, there's a way to take

15   into account that second count.

16         And I forgot your last question.  So your last

17   question was application of whether it's one unit or two

18   units --

19         MS. PASCUCCI:  I think my -- our analysis was that if

12:07 20   they're grouped, it's an increase of one unit and if they're

21   not grouped, it's an increase of two units.

22         THE COURT:  And I'm just looking at paragraph 77 of

23   the PSR.  And if I'm reading this correctly, one additional

24   unit assigned for each group that is equally serious from one

25   to four levels.

         1            PROBATION OFFICER:  Correct.

         2            THE COURT:  So, instead of two, it would be one if it

         3       were -- or I guess there would be no increase if --

         4            PROBATION OFFICER:  There would be no increase.

         5            THE COURT:  There would be no increase because they

         6       wouldn't be grouped.

         7            PROBATION OFFICER:  Correct.

         8            THE COURT:  Thank you.

         9            Counsel, did you have something else on that last --

12:08   10            MS. PASCUCCI:  Your Honor, I just point also to that

        11       we don't see (a), (b), (c), and (d) all need be to be

        12       satisfied.  There's a reason that same victim is separate from

        13       (d).  And we also point just generally to the language of

        14       involving substantially the same harm, that this case involves

        15       a single scope of conduct.

        16            THE COURT:  Okay.

        17            Understood.  I understood them to be alternatives.

        18            And, counsel, like I said, I think other than now the

        19       grouping, I think we've addressed all of the disputed issues on

12:09   20       guidelines, which I do want to take under advisement.

        21            I do have a sense of your respective recommendations

        22       for what the sentence would be, but, counsel, if you wanted to

        23       add anything in that regard, I'd like to consider that as well.

        24            MS. KAPLAN:  Okay.

        25            Thank you, your Honor.

1    MS. KAPLAN:  Unfortunately, I did not have an

2    opportunity to reach some of the individuals who I know wanted

3    to be here for the sentencing today but just want to point out

4    to the Court that there are representatives from NER, including

5    the Sylvester Trust and members of the Sylvester family who are

6    here as well.

7    THE COURT:  Thank you.

8    MS. KAPLAN:  Your Honor, the defendant pled guilty --

9    THE COURT:  And let me just make clear -- and I was

12:09 10   going to say this in regards to the allocution by Mr. LoConte,

11   if he chooses to make one, since I'm going to do this in two

12   parts, if there were people that wanted to be heard, I would

13   hear them at the second, and Mr. LoConte can be heard now or

14   when I do part two of the sentencing.

15   MS. KAPLAN:  Okay.

16   The defendant pled guilty to a payroll scheme

17   involving mail fraud and failure to pay taxes that dates back

18   to January of 2014 and continued until May of 2022.

19   The government is recommending a sentence of 46 months

12:10 20   of imprisonment, 36 months of supervised release, a $200

21   special assessment, a fine at the discretion of the Court, and

22   restitution in the amount of $3,035,648 to the IRS; $210,570 to

23   the Massachusetts Department of Revenue; $596,462 to NER; and

24   $1,094,504 to the benefit funds broken down as I previously

25   suggested, your Honor.

1    I want to start by recognizing that this is a high-end

2    guideline recommendation, but, given the circumstances,

3    especially with all of the additional amounts of money that

4    were not included in the loss amount that we believe it's

5    warranted.

6    Obviously the guidelines here are driven by the loss

7    amount, and we believe that the government's recommended

8    sentence is sufficient, but not greater than necessary, to

9    comply with the purposes of the sentencing guidelines.

12:11 10    The government has set out in its sentencing memo and

11    supplemental sentencing memo the reasons for recommending such

12    a sentence, which are pursuant to the goals enumerated in

13    3553(a).  And given the lengthy filings in this case, I will

14    try not to repeat all of reasons here.

15    The scheme of the Flowers program was discovered by a

16    newly hired payroll employee who had literally only been

17    working a few weeks at NER when she learned about the

18    off-the-books payments and the Flowers program.

19    When she immediately complained to her supervisors,

12:11 20    she was shot down and told, That is how we do things.

21    Upon being terminated after a mere few weeks of

22    starting work, she filed a complaint with the Attorney

23    General's office.

24    The scheme involved defrauding the Mass. Laborers'

25    Benefit Funds, as was defined in paragraph 5 of the indictment;

the Bricklayers' Benefit Funds; the IRS; NER's employees; and
the majority owner of NER, the Sylvester Trust.

The defendant was the president and the only corporate
officer of NER. He had a 40 percent ownership stake in NER.
He was the sole trustee in the trust that owned the other 60
percent of the NER. So, essentially, the defendant had 100
percent control over NER; and he engaged in a payroll scheme
that became known as the Flowers program whereby certain union
employees of NER, laborers or bricklayers, were paid off the
books for overtime hours worked without the defendant reporting
these hours to the benefit funds and without making the
required payroll taxes withholdings and payments.

At times, some of these employees were paid entirely
in cash for overtime hours worked, and at other times the
employees were paid by check without the required withholdings.
These are what we refer to as the non-p'roll checks or the
non-p checks.

The reason that the defendant issued these non-p
checks or vendor checks and characterized them as vendor
payments -- by the way, these employees were not, never were
vendors -- was so that he could conceal these payments so he
would not have to pay taxes on this money. Essentially, he had
a second set of books that were the vendor payments.

To facilitate the scheme, defendant directed certain
employees of NER's management company, or NEM, to cash NER

1    checks at NER's bank and thereafter distribute the cash

2    payments to these laborers and bricklayers for the overtime

3    hours worked.

4         He paid his employees in this way not only to avoid

5    paying the proper payroll taxes but to avoid making the hourly

6    wage and benefit fund payments and dues constitutions as

7    required by the various collective bargaining agreements.

8         He also directed and assigned office employees to

9    prepare and file the IRS Form 941s for tax years 2016 through

12:14 10    2021 on behalf of NER and NEM that were false.

11         He also deliberately failed to report to the IRS the

12    off-the-books wages, bonuses and vehicle expenses he caused to

13    be paid to his employees, as required.

14         He did this all while knowing that for each calendar

15    quarter reported on the Forms 941, the actual total employees'

16    wages subject to withholding were in amounts substantially

17    greater than reported upon which there were additional

18    employment taxes due and owing to the United States.

19         Moreover, from April 2021 through March 2022,

12:14 20    defendant caused NER to withhold trust fund taxes from the

21    paychecks of his employees and actually reported the withheld

22    taxes on filed Forms 941 as required, but then decided not to

23    pay the IRS the full amount of trust fund taxes withheld

24    totaling over $2 million.

25         And I just want to comment that -- I forgot to address

1    it before -- but this issue that the trust fund payments should

2    not be included in the tax loss, that's precisely what Count

3    Ten addresses, are the trust fund taxes.  The defendant had an

4    obligation to pay trust fund taxes.  Instead, from January of

5    2014 to December of 2021, the defendant used NER monies to

6    purchase and pay for various personal expenses, including

7    vehicles, personal property taxes for houses in Beverly;

8    Ipswich; Andover, Massachusetts; and Naples, Florida; household

9    improvements; golf club memberships; and cars for his wife and

12:15 10   his girlfriend.

11         Looking at the 3553(a) factors, the nature and

12   circumstances of the offense are significant.  These are crimes

13   of calculation.  They were driven by the defendant's greed, his

14   deliberate violations of the federal tax code, and his lies to

15   the benefit funds.

16         The gravity of defendant's crimes are significant as

17   outlined in the letter received from the Mass. Laborers'

18   Benefit Funds.  Both the Mass. Laborers' Benefit Funds, the

19   District Council, and the bricklayers' funds were deprived of

12:16 20   over $1 million in contributions and dues for its members.

21   This is money that effects the health, the welfare and pension

22   plans that existed to benefit NER's hardworking employees who

23   were members of the various unions.

24         Defendant's crimes caused substantial harm to NER's

25   employees.  They were deprived of collectively bargained for

1    income and contributions to their fringe benefits.

2        Nonetheless, the defendant wants you to believe that

3    these laborers and bricklayers who participated in the Flowers

4    program wanted to be paid off the books, although they have

5    submitted no evidence to support this claim.

6        Yes, these employees avoided payment of taxes of the

7    wages for those off-the-books hours, but having interviewed

8    these individuals myself, your Honor, I can represent to the

9    Court that these are hardworking immigrants who came in with

12:17 10  counsel and sometimes initially lied to protect this man

11   because they were afraid of the government, of the IRS, of the

12   union, and of the defendant.  But when confronted with the

13   documents, they admitted, many times tearfully, because they

14   had no choice but to admit it, that they had accepted being a

15   participant in the Flowers program because they had no choice

16   and at great risk to themselves.

17       And what they told us was that they had no choice, if

18   they wanted to work, they had to accept defendant's terms.

19   Indeed, when they complained about this practice, that's

12:17 20  exactly what they were told: if they wanted to provide for

21   their families, they had to agree to defendant's terms.

22       The payroll taxes alone defendant failed to remit were

23   over $3 million.  The United States government is impacted any

24   time taxpayers fail to collect and pay over payroll taxes.

25   Here, over $3 million was not paid by defendant in payroll

       1    taxes, and that's hardly an insignificant amount of money.

       2            As a result, defendant's scheme exposed NER and its

       3    employees to significant tax liability.  And I would direct

       4    your Honor's attention to the affidavit submitted by John

       5    Bosen, who is the chairman of NER's board of directors, it's

       6    Exhibit 5 to the government's sentencing memo, for more on

       7    that.

       8            I would also quote from the letter submitted by Edward

       9    Callahan of EJ Callahan & Associates, who, after NER's

12:18 10    accountants essentially fired NER as a client, he was asked to

      11    perform CPA services.  He apparently declined because of the

      12    poor condition of NER.  And later, in 2022, after the defendant

      13    was terminated, he became an advisory board member of NER to

      14    review NER's financials and give insight into them.

      15            He said, in summary, Mr. LoConte did not, quote, bring

      16    NER back from the brink, as claimed in his sentencing memo, and

      17    his sole stewardship of NER was full of mismanagement and

      18    fraudulent practices that has left the company today on the

      19    brink of bankruptcy.

12:19 20            Defendant's crimes also caused substantial harm to the

      21    trust who is now 100 percent owner of NER and left NER in a

      22    seriously precarious financial condition as outlined in the

      23    affidavit of Mr. Bosen, Exhibit 5, and the letter submitted by

      24    Joseph Mesina on behalf NER.

      25            In addition, even though the defendant was clearly the

1  responsible person for payment of NER and NEM's payroll taxes

2  and, therefore, is solely responsible for nonpayment of those

3  taxes, NER and NEM is now saddled with tax liability caused by

4  defendant's failure to pay in excess of $3 million in taxes,

5  payroll taxes.

6        Turning to the characteristics of the defendant.  This

7  is a man with three homes, that rather than pay his employees,

8  hardworking laborers, at the correct overtime rate, and rather

9  than make contributions to his employees' health and welfare

12:20 10  funds and retirement plans, and rather than to pay payroll

11  taxes, as required, to the United States government, he chose

12  to use NER's money as his own personal piggy bank to improve

13  his multimillion-dollar vacation homes in Naples, Florida and

14  Kennebunkport, Maine.  He used that money to pay his property

15  taxes, personal vehicles, cars for his wife and girlfriend, and

16  golf memberships.

17        Just by way of example, your Honor, as recently as

18  this past March, clearly after the defendant had already been

19  indicted and after I stood before the magistrate in this case

12:20 20  and complained that I feared the defendant was dissipating

21  assets, the defendant incurred $215,000 -- over $215,000 in

22  costs to add a spa and wet bar to his existing pool with marble

23  for the pool deck, installation of palm trees, lighting, and an

24  outdoor kitchen and fireplace.  He had all this work done at a

25  time when he knew he would have to pay restitution.

         1          Instead, he just thumbed his nose at the government,

         2    the union, the IRS, NER, and the Sylvester family, because that

         3    money is now in these various homes which would require the

         4    government to wait to sell his homes before it can get that

         5    money to pay back restitution.

         6          The unfortunate truth --

         7          THE COURT:  Counsel, is there a forfeiture motion

         8    here?

         9          MS. KAPLAN:  No, there is not.  It's all restitution,

12:21 10    your Honor.

        11          THE COURT:  Thank you.

        12          MS. KAPLAN:  The unfortunate truth, your Honor, is

        13    that the defendant had the good fortune to take over an

        14    established business with a really good reputation that he used

        15    to personally enrich himself while, at the same time, as

        16    outlined in John Bosen's affidavit, he was bleeding the estate

        17    and NER dry of its assets.

        18          The defendant repeatedly has told this Court that

        19    there's nothing wrong with taking money out of your own company

12:22 20    to pay personal expenses.  And I'm sure that's what they're

        21    going to argue, your Honor.  And in some circumstances that may

        22    be true, but it's not true where you are the 40 percent owner;

        23    it's not true where you failed to make contributions to your

        24    employee's benefit funds and dues as required by the collective

        25    bargaining agreements; it's not true where you failed to pay

payroll taxes on behalf of your employees for their overtime

hours and for raises and bonuses and which he disguised as

vehicle expenses and vendor payments, shorting the United

States government and the state of Massachusetts of over $3

million; and it's not true where you failed to pay proper

overtime wages for your employees.

There's no question that the defendant may have been

generous and helped certain people who were down on their luck

or had health problems, as evidenced by the letters of support

submitted to the Court. But what he failed to appreciate was

that it was not up to him to pick and choose who he helped and

who gets paid. He doesn't get to decide that he's going to

forgo making contributions to the benefit funds on behalf of

his employees who, make no mistake about it, were all

hardworking, hourly wage employees who desperately needed the

work to provide for their families. He doesn't get to make the

decision that he's to forgo paying taxes to the United States

government and the state of Massachusetts. He doesn't get to

make those decisions, at least without suffering the

consequences if he is caught, and these letters of support

serve no purpose other than to generate sympathy for him.

Defendant could have turned NER around. He was

repeatedly warned about his illegal payroll practices by

multiple people, both NER employees, several different

controllers as well as outside accountants and consultants that

1    he hired.  He was told repeatedly that what he was doing was

2    wrong and that he had to stop, but he didn't.

3          He made a choice and the choice was to enrich himself.

4    And it was not until a payroll assistant, who had only worked

5    at NER for a mere few weeks, complained to the Massachusetts

6    Attorney General's office and the issuance of federal grand

7    jury subpoenas that the defendant finally stopped making these

8    off-the-books payments and stopped hiding these off-the-books

9    payments as vendor expenses and stopped characterizing raises

12:24 10    as vehicle expenses and stopped paying bonuses off the books,

11    and ultimately discontinued his illegal payroll scheme.

12          He knew right and wrong, and his knowing and wilful

13    conduct merits the government's recommended high guideline

14    sentence.

15          THE COURT:  Counsel, what consideration have you given

16    to the cases that were cited in Mr. LoConte's sentencing memo

17    regarding what is presented as similar cases or at least cases

18    involving similar charges in regards to the range of sentences

19    that were imposed there?

12:24 20          MS. KAPLAN:  Well, I think in those cases -- I mean, I

21    haven't reviewed them since I first read the sentencing memo,

22    but I don't believe in those cases that there was as much money

23    involved that was not included in the loss amount as there is

24    here.  I mean, there was -- you know, the overtime rate that

25    wasn't paid properly, there was the personal expenses that

1    weren't paid.  So I believe in this situation where so much of

2    loss is not being accounted for that it's appropriate.

3              THE COURT:  Thank you.

4              MS. KAPLAN:  With respect to specific and general

5    deterrence, a significant sentence is required here, your

6    Honor, to deter both defendant and other corporate officers

7    from engaging in the conduct that led to the charges here.

8              A sentence of 46 months will let signatory contractors

9    know that they will be punished if they lie about their

12:25 10   company's payments on remittance reports in order to avoid

11   paying the benefits due and owing the wages.

12             The public must know if you violate the tax and

13   reporting laws, you go to prison.

14             If the price of lying about your payroll on your

15   corporate tax returns and in remittance reports is just to pay

16   the money back, which defendant clearly has the ability to do,

17   and continue on with your professional and personal life,

18   there's no deterrent effect.

19             As for specific deterrence, the defendant, who is

12:26 20   entrusted with the operation and management of this company,

21   must now learn that the choices he made to enrich himself at

22   the expense of others has consequences.

23             And lastly, your Honor, the sentence must provide for

24   just punishment for the multiple crimes committed by the

25   defendant.  Allowing this defendant to simply make restitution

1    when we know he has the means to do so without a significant

2    sentence will give the defendant a huge windfall.  He

3    essentially will have been permitted to borrow millions of

4    dollars from this company for his own personal benefit, all at

5    the expense of the hardworking members of the laborers' and the

6    bricklayers' union, the company itself, as well as the United

7    States government.  Restitution alone would not be a just

8    sentence.

9            Considering the 3553(a) factors, your Honor, including

12:26 10   the nature and circumstances of the offenses of conviction and

11   the seriousness of those offenses, the sentence as I previously

12   outlined is sufficient, but not greater than necessary, to

13   comply with the goals of the sentencing guidelines.

14           THE COURT:  Thank you.

15           Counsel.

16           MS. PASCUCCI:  Thank you, your Honor.

17           Your Honor, first off, I want to note that the

18   guidelines here are advisory and not mandatory here, regardless

19   of what guidelines we come to, and that we need to focus on the

12:27 20   3553(a) factors.

21           And the first one that I want to talk to is the need

22   to avoid unwarranted sentencing disparities.  And one thing

23   that Ms. Kaplan spoke about in her discussion just now is other

24   people that worked at NER.  And, your Honor, this scheme at

25   NER, it was not a secret, it was not something that others were

1    forced to go forward with, others were involved with it.  And I

2    point you to what I believe is paragraphs 55 through 58 in the

3    PSR where there are emails where other employees at NER,

4    without Mr. LoConte being copied or otherwise included on those

5    emails, are directing payments to workers.  It's not him

6    directing them, it's other employees.  This is not to say that

7    Mr. LoConte was not involved in the scheme or that he could not

8    have stopped the scheme.  He accepts responsibility for it, but

9    that is to say that other people, including management at NER,

12:28  10   including people who continue to work at NER today, very well

11   could have been charged in this case and weren't; and,

12   therefore, we don't have another defendant in this case where

13   we can compare a sentence to with respect to Mr. LoConte.

14          And in the absence of that, I'd refer your Honor to a

15   recent case out of your session, United States v. Schofield,

16   which really involved, if anything, more serious conduct, taxes

17   that were actually withheld from employee's paychecks and then

18   not paid to the government.  And there, the defendant received

19   nine months.  And I know, your Honor, that every defendant,

12:29  20   every case --

21          THE COURT:  I think the loss amount was less, counsel,

22   I mean, depending on what the calculation is.

23          MS. PASCUCCI:  I believe it may have been in the

24   environment of loss amount we are recommending here by your

25   Honor.

     But that being said, even if you look at the cases
that we cite from other sessions within this court, cases that
have millions of dollars in loss to the IRS, we are looking at
sentences of probation or sentences of less than a year
incarceration.

          THE COURT:  These are the cases you cited?

          MS. PASCUCCI:  Yes, your Honor.

          And, your Honor, I think this also dovetails -- and,
your Honor, to the government's point of, well, there's loss
that's not being counted here, the government has pointed to
charges to which he did not plead guilty to what they said they
would have charged him involving personal tax fraud and
embezzlement.  He has never pleaded guilty to these charges,
and he's never indicated a willingness to do so.  Simply, there
is no wrongdoing and embezzlement from NER and personal tax
liability here.  And this idea of this amorphous other loss
that's not included shouldn't be part of the Court's
consideration.  If the government wanted to include those
figures of loss, they should have included it as loss and not
used amorphous other loss.

          THE COURT:  So you in your papers and now have
mentioned this idea of other people not being charged.  I
understand perhaps the lack of comparators in this case, but
I'm not sure it's a proper consideration for my sentencing
beyond that, would you agree with that?

         1          MS. PASCUCCI:  Your Honor, I think that what it is

         2    important to is also getting to the history and characteristics

         3    of Mr. LoConte.

         4          Mr. LoConte has accepted responsibility for this when

         5    no one else has.  And I also want to note with just punishment

         6    and deterrence, it's not only Mr. LoConte who's the only one to

         7    stand here today.  But Ms. Kaplan mentioned him having

         8    inherited NER, and she makes it seem like he inherited this

         9    fully formed, profitable company.  That is simply not accurate,

12:31   10    your Honor --

        11          THE COURT:  And I have read the -- I understand your

        12    point in that regard.

        13          I guess, what would -- what, if anything, would the

        14    defense have me make of the allegation that Mr. LoConte used

        15    funds from NER for personal use?

        16          MS. PASCUCCI:  Your Honor, it was a company that he

        17    owned, along with the Sylvester Trust, and he took --

        18          THE COURT:  Well, 40 percent.  Doesn't that cut --

        19          MS. PASCUCCI:  Your Honor --

12:31   20          THE COURT:  -- one way or the other?

        21          MS. PASCUCCI:  Your Honor, to mention that, to go off

        22    of that, it is -- it is not just funds he took out for his

        23    personal expenses, and any suggestion that this is just funds

        24    for his personal expenses is wrong.  It's funds that he also

        25    took out for the Sylvesters, and we include in our sentencing

```
 1   memo --
 2            THE COURT:  For personal expenses.
 3            MS. PASCUCCI:  For personal expenses.
 4            We include in the sentencing memo a list of personal
 5   expenses that came out of NER for the Sylvesters.
 6            THE COURT:  I do recall that.
 7            MS. PASCUCCI:  Yes, your Honor.
 8            THE COURT:  But I guess my point is, shouldn't I -- to
 9   Ms. Kaplan's point -- shouldn't I consider that against the tax
12:32 10   liability and the benefits and contributions he wasn't paying?
11            MS. PASCUCCI:  Your Honor --
12            THE COURT:  Meaning, I understand your point that he's
13   not the only person perhaps who's benefitting from money coming
14   out for personal reasons, but it seems to me I get to consider
15   that against what's not being paid, which should have been
16   paid.
17            MS. PASCUCCI:  Your Honor, to the extent that you're
18   considering it in terms of the loss that's already being
19   attributed to the IRS, we don't object to that, but what we do
12:33 20   object to is the idea that this is a loss to NER, that his
21   embezzled funds somehow turned -- funds which we would object
22   to were ever embezzled -- that this would ever suggest that
23   there was a loss to NER from funds that he took out of NER.
24            Again, to the extent you want to consider that for
25   purposes of loss to the IRS or the Massachusetts Department of
```

1    Revenue, that's one thing, but it's another to try to turn this

2    into an embezzlement case.

3           And, your Honor, this would bring me to the fact that

4    Mr. LoConte, when he took over the company in 2012 and 2013, he

5    put his personal guarantee on the line.

6           THE COURT:  Was this the quarter of million dollars?

7           MS. PASCUCCI:  This, your Honor, I believe this is $6

8    million personal guarantee but now stands with Fidelity Bank.

9    And I want to look back at the footnote to make sure I have

12:34 10    that figure exactly correct, but it's mentioned in our

11    sentencing papers.

12           Fidelity Bank has now sued Mr. LoConte and no other

13    owner of NER and not NER on that personal guarantee.  And that

14    was a personal guarantee that Mr. LoConte put forward, because

15    in 2012 -- when the prior owner of NER had tragically died of a

16    heroin overdose, it was Mr. LoConte who stepped in.

17           And this idea that NER was doing very well, I want to

18    quote the supplemental long form agreement that we submitted to

19    Probation that at the time in early 2012, NER had sustained

12:34 20    overdrafts and delinquent financial reporting, and it was a

21    condition that Mr. LoConte come on for NER to continue

22    operating for people to keep their jobs.

23           And, your Honor, I just would also say that for

24    purposes of the civil allegations that have been raised as --

25    in terms of Mr. LoConte's duty to the trust, this has to do

1    with a case that's currently in front of the Business

2    Litigation Section of the Superior Court.

3          The arguments in that case are civil arguments and

4    simply have nothing to do with the case here.  And that's my

5    other issue with these embezzlement claims, is that this has to

6    do with the civil allegations and we're really concerned that

7    these civil allegations are infecting this case and broadening

8    the scope of loss to be considered.

9          Ms. Kaplan mentioned the letter by Mr. Callahan.

12:35 10    Mr. Callahan is not an accountant who ever worked at NER at the

11    same time as Mr. LoConte.  And if you review his letter, there

12    is, in fact, no indication of what he reviewed in making

13    determinations of Mr. LoConte's conduct or NER's financial

14    well-being.  And the other thing about that letter is that it

15    was submitted to this Court by civil counsel in the BLS case.

16          And frankly, your Honor, if every case of breach of

17    fiduciary duty before the BLS was, in fact, a Federal District

18    Court criminal case, this court would simply be overflowing

19    with cases, because those type of cases are just the bread and

12:36 20    butter of BLS.

21          I next want to turn to the nature and circumstances of

22    the offense.  And, your Honor, it can't be said enough that

23    this is a payroll tax scheme.  And again, to the extent we're

24    getting at the NER or the trust or any other individuals other

25    than the benefit funds and the IRS being victims, we're looking

1    at counts and conduct that simply is not charged here.

2         And Ms. Kaplan has mentioned multiple times him

3    profiting from workers of the company, and we think this is

4    really just a mischaracterization.  And the workers, what it

5    comes down to is the person that complained about the conduct

6    was not someone who was a laborer and it wasn't someone who was

7    a bricklayer.  There would have been -- if a laborer or

8    bricklayer had made one call to their union about what was

9    going on in this case, the practice would have stopped.  And no

12:37 10   one ever did.  And I think that that speaks to whether those

11   people were really victims or not, even an anonymous call of

12   what's going on.

13        THE COURT:  I mean, counsel, aren't there other

14   possibilities in terms of Ms. Kaplan's point about people being

15   concerned if they complained?

16        MS. PASCUCCI:  Your Honor, if someone had made even an

17   anonymous call to the union, the union had every reason to make

18   sure that their benefit funds were being properly paid.  And we

19   think that there wasn't -- it's one thing to say they didn't

12:37 20   complain to NER, they were concerned about blowback from NER.

21   It's another thing to say that no one actually complained to

22   the union, because the union would have instantly put a stop to

23   it had they known.

24        THE COURT:  I guess I'm missing your broader point on

25   this.

1          MS. PASCUCCI:  Your Honor, I want to rebut the

2     government's --

3          THE COURT:  Meaning, what difference does that make?

4          MS. PASCUCCI:  Your Honor, again, it goes to the

5     nature and circumstances of the offense.  The government has

6     spoken about the seriousness of this crime with an idea that it

7     was not just the benefit funds and IRS that were victims but,

8     in fact, we're talking about a broader swath of victims in this

9     case.  And we really strenuously object to this idea that we're

12:38 10    looking at this broad swath of victims reaching workers and

11    co-workers at NER; in fact, those workers at NER were going

12    along with the scheme.

13          And this idea that everyone was complaining to him on

14    a regular basis and he kept going in the face of opposition is

15    simply how the scheme worked, and it's not actually what

16    happened.

17          And, your Honor, again, he still -- he accepts

18    responsibility for the seriousness of this, but I think

19    understanding the context of how this actually operated is

12:39 20    integral to understanding the nature and circumstances of the

21    offense.

22          And, your Honor, it also goes to the history and

23    characteristics of the defendant, too.  And the idea --

24          THE COURT:  So, I guess, counsel, just to sort of push

25    on this point a little bit more, I think I understand your

point.  I mean, at the -- and I know you dispute some of this,

but at the end of the day, NRA (sic.) is out some money, the

funds are out some money, and certainly there's money due to

the IRS.  But in terms of harm to actual employees, I

understand the point that they aren't harmed in the sense that

they were paid their money, but didn't it leave them open to

possible liability for tax?

MS. PASCUCCI:  Your Honor, while it did, it's our

understanding that employees, in fact, could have declined to

12:40  go ahead with the scheme.

And I would actually point you to one of the MOIs that

we referred to where an employee is saying we would give

people -- we would give people the option and they could do --

and they could be part of the scheme or they couldn't.  I think

that we would reject the idea that this was a scheme that

people simply had to be a part of.

And, your Honor, the fact of the matter is that our

understanding is that when people, individuals, are paid under

the table, they have a higher take home pay.  So that's one of

12:40  the reasons that people oftentimes don't actually object to

being offered to being paid under the table.

THE COURT:  Thank you.

MS. PASCUCCI:  And that, in addition, those employees,

had they wanted to, they were getting the income sometimes by

check, and they could have reported that in their own personal

1    income tax returns, and Mr. LoConte never prevented them from
2    doing that.
3         And, your Honor, I want to just, lastly, turn to the
4    history and characteristics of the defendant.  And your
5    Honor --
6              THE COURT:  Yes.
7              MS. PASCUCCI:  -- Mr. LoConte is a veteran.  He
8    received an honorable discharge from the Air Force.  And he
9    took over -- as mentioned, he started working at NER in the
10   1980s.  He worked hard for the company, and he took over in
11   2012, putting his own personal guarantee on the line so other
12   people could keep their jobs.
13        He -- and this idea -- again, your Honor, this idea
14   that he worked to the detriment of people around him is just
15   completely offset by the letters of support that he received.
16        And I want to rebut the government's point that these
17   letters of support are simply to generate sympathy.  These
18   letters of support are about the history and characteristics of
19   the defendant, which is a proper consideration under 3553(a),
20   and these letters of support --
21             THE COURT:  And I've read them, counsel.
22             MS. PASCUCCI:  Thank you, your Honor.
23        These letters of support detail what he did for his
24   employees, and not just his employees, but being there for his
25   family as well.

1        And, your Honor, I lastly want to note that to this

2    day, Mr. LoConte continues to work, and he's now working -- he

3    now owns Fina Stoneworks.  This is a company that now employs

4    12 individuals.  And if Mr. LoConte were to be incarcerated,

5    those individuals would all -- it is likely that the company

6    would not be able to continue working and those individuals

7    would lose their job.

8        Your Honor, all of these facts, and in particular,

9    again, I want to point to similar cases with similar amounts of

12:43 10    loss in this court, weigh in favor of a sentence of probation,

11    which we believe is what is no greater than necessary in this

12    case.

13        THE COURT:  Thank you.

14        MS. PASCUCCI:  Thank you.

15        THE COURT:  And, Mr. LoConte, as I indicated before,

16    you have the opportunity to address me, if you'd like to.

17    Since I'm going to continue this hearing to give some

18    consideration to the arguments made on either side, I'll give

19    you the opportunity to make that statement now or to wait until

12:43 20    we continue the hearing.

21        THE DEFENDANT:  Thank you, your Honor.  I'd like to

22    read a statement now, if I could.

23        THE COURT:  Sure.

24        THE DEFENDANT:  Thank you for allowing me to read this

25    statement.

1          First, I'd like to apologize to the Court, to my

2    friends, former and current employees, most of all my family,

3    for my actions that has brought me here today.

4          I have caused immeasurable harm to my -- and

5    embarrassment to my reputation, my friends, colleagues,

6    employees, and my family, which include my elderly parents.

7          I've always tried to live my life as a good person, a

8    person willing and able to help others.  I believe I've done

9    the best to add value to society, and once this is behind me,

12:44 10   I'll do my best to go back to that person.

11          I've been in the construction industry for over 40

12    years.  1982, when I got out of the Air Force, I went into the

13    masons apprenticeship program and started working part time for

14    Richard Sylvester, Sr. in the offseason.  Then, in '85, I began

15    working for Richard Sylvester, Jr. as a subcontractor.

16          In 1990, I sold my business, equipment to Richard

17    Sylvester, Jr. and joined NER as a full-time employee.

18          I worked as Richard's right-hand man for 30 years,

19    working closely with him and learning how to run the business

12:45 20   until January 2013 when the whole thing came crashing to an end

21    when Mr. Sylvester died of a drug overdose.

22          In 2013, when I became an owner of NER at the

23    insistence of TD Bank, I had the opportunity to stop the

24    practice of paying employees cash for overtime, but I didn't.

25    I don't know if it was my belief that this was common in our

 1  industry or it was my arrogance.  Either way, I should have

 2  known better, and I should have stopped it.  And for this

 3  reason I stand before you today a highly embarrassed and

 4  remorseful man.

 5       When I look into the faces of my family, I see the

 6  pain that I've caused them; it breaks my heart.

 7       I know I must accept responsibility for my actions and

 8  I will.  But I will never find myself in this situation again,

 9  and I've been working in the stone fabrication business since I

12:45 10  was fired by NER's board of directors.

11       Fina Stoneworks is a business I started in 2017 that

12  has yet to become successful.  I believe it's a good business

13  in a niche market, and I have -- and I made sure that we comply

14  with applicable laws and regulations.  We have engaged a

15  payroll service to help guarantee everything is done the right

16  way.

17       I lost my business at NER, my other business is near

18  failure with the departure of key employees, all caused by my

19  actions.

12:46 20       I spent 40 years building a business employing

21  hundreds of workers, building my reputation, only to have it

22  decimated by my actions.

23       Lastly, I respectfully ask the Court to consider

24  fashioning a sentence that would allow me to keep working in

25  the business and try to make it successful and provide jobs and

```
 1    opportunities to other employees.

 2             Again, thank you for your time and consideration.

 3             THE COURT:  Thank you.

 4             Thank you, Mr. LoConte.

 5             Counsel, as I said, I wanted to give this further

 6    thought.  Let's pick a continuation date.

 7             (Discussion off the record.)

 8             THE COURT:  Counsel, are both sides available Monday,

 9    March 18th at 2:00?

12:47 10            MS. KAPLAN:  The government is, your Honor.

11             MS. PASCUCCI:  Yes, your Honor, we are available.

12             THE COURT:  Okay.

13             So we will -- Mr. LoConte, we'll resume then, okay?

14             THE DEFENDANT:  What time is it?

15             MS. PASCUCCI:  2:00.

16             THE COURT:  That was 2:00.

17             THE DEFENDANT:  Thank you, your Honor.

18             THE COURT:  Counsel, as always, thank you for your

19    arguments either side.  Thank you.

12:48 20            THE CLERK:  All rise.

21             (Court adjourned at 12:48 p.m.)

22                       - - - - - - - - - - - -

23

24

25
```

```
 1                         CERTIFICATION

 2          I certify that the foregoing is a correct transcript

 3   of the record of proceedings in the above-entitled matter to

 4   the best of my skill and ability.

 5

 6

 7

 8   /s/Debra M. Joyce_____        April 22, 2024_____
     Debra M. Joyce, RMR, CRR, FCRR       Date
 9   Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```