# Exhibit E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA,

                  Plaintiff,      Criminal Action
                                    No. 22-10274-DJC

V.

                                    March 18, 2024

FRANK LoCONTE,                 2:00 p.m.

                  Defendant.

_____

TRANSCRIPT OF SENTENCING DAY 2

BEFORE THE HONORABLE DENISE J. CASPER

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210

DEBRA M. JOYCE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
joycedebra@gmail.com

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:

 3   LAURA KAPLAN, ESQ.
     United States Attorney's Office
 4   John Joseph Moakley Federal Courthouse
     1 Courthouse Way
 5   Suite 9200
     Boston, MA 02210
 6   617-748-3124
     laura.kaplan@usdoj.gov
 7
     FOR THE DEFENDANT:
 8
     MICHELLE R. PASCUCCI, ESQ.
 9   GEORGE W. VIEN, ESQ.
     Donnelly, Conroy & Gelhaar, LLP
10   Suite 1600
     260 Franklin Street
11   Boston, MA 02110
     617-720-2880
12   mrp@dcglaw.com
     gwv@dcglaw.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              (The following proceedings were held in open

 3    court before the Honorable Denise J. Casper, United States

 4    District Judge, United States District Court, District of

 5    Massachusetts, at the John J. Moakley United States Courthouse,

 6    1 Courthouse Way, Boston, Massachusetts, on March 18, 2024.

 7              The defendant, Frank LoConte, is present with counsel.

 8    The Assistant U.S. Attorney is present.)

 9              THE CLERK:  All rise.

10              (The Court entered the courtroom.)

11              THE CLERK:  Court is in session.  Please be seated.

12              Criminal action 22-10274, United States v. Frank

13    LoConte.

14              Would counsel please state your name for the record.

15              MS. KAPLAN:  Good afternoon, your Honor.  Laura Kaplan

16    on behalf of the government.

17              THE COURT:  Good afternoon, counsel.

18              MS. PASCUCCI:  Good afternoon, your Honor.  Michelle

19    Pascucci and George Vien on behalf of the defendant.

20              THE COURT:  Good afternoon.

21              Good afternoon, counsel.

22              Good afternoon, sir.

23              THE DEFENDANT:  Good afternoon.

24              THE COURT:  Counsel, sir, since there was much in

25    dispute between the parties about the guideline calculations
```

 1   and ultimately what the sentence would be, I split the

 2   sentencing into two parts.

 3         On February 21st, I heard counsel's arguments about

 4   the calculations and the recommendations on either side, having

 5   previously reviewed the submissions by either side, including

 6   two victim impact letters, and I heard Mr. LoConte's statement

 7   to this Court.

 8         Unless there are victims that wanted to be heard

 9   today, counsel?

02:01 10        MS. KAPLAN:  There is one, your Honor.

11        THE COURT:  Okay.

12        And then I'll give Mr. LoConte an opportunity to be

13   heard again, if he would like to be.

14        Counsel, who's the victim?

15        MS. KAPLAN:  Nick Sylvester, who is the current chief

16   operating officer of NER.

17        THE COURT:  He may approach the podium.  Thank you.

18        MR. SYLVESTER:  Good afternoon, your Honor.

19        (Discussion off the record.)

02:02 20        THE COURT:  Good afternoon.

21        MR. SYLVESTER:  Good afternoon.

22        My name is Nicholas Sylvester.  I want to thank the

23   Court for the opportunity to speak today on behalf of NER, its

24   employees, and my family.

25        I am now the chief operating officer of NER

1    Construction, the company started by my father and his father.

2         Now that Mr. LoConte's reign at NER has been

3    terminated, the company is guided by a new, independent board

4    of directors and professional management.

5         The crimes to which Mr. LoConte has pleaded guilty to

6    have deeply impacted NER and its employees.  Mr. LoConte's

7    crimes resulted in long-term business partners walking away

8    from working with NER.  Because Mr. LoConte did not pay

9    contributions to the laborers' benefit funds, companies would

02:03 10   not hire NER due to the risk associated with the union's

11   pulling workers from their projects, paired with the fact that

12   many companies plainly did not want to work with the company

13   that had been run by a man of Mr. LoConte's character.  In 2023

14   alone, two large, previously booked projects valued at $9

15   million were lost directly because of his indictment.  This put

16   the jobs of almost 100 NER workers at risk.

17        The financial impact of Mr. LoConte's crimes on NER

18   has been drastic and will be long-lasting.  The company is

19   saddled with debt in a workout with our bank and earnestly

02:03 20   working to recover and move forward under its new stewardship.

21        There is also the impact on my family.  The primary

22   asset my father left for his children when he died was NER,

23   along with an estate comprised of some real estate and other

24   funds.  My father trusted Mr. LoConte to be the administrator

25   of his estate and the only trustee of his family trust for the

1    benefit of his children and the president of his company, NER

2    Construction.

3          Mr. LoConte betrayed the trust of my late father --

4    betrayed the trust my late father put in him and has left my

5    family with almost nothing.  After ten years of Frank LoConte's

6    total control, the company balance sheet is in disarray, all

7    the estate money is gone, and the last piece of my family real

8    state in foreclosure.

9          At the hearing on March 5th, I heard LoConte's

02:04  10    attorney attempt to justify his conduct in taking millions of

11    dollars in personal expenses out of NER to fund his lifestyle

12    by pointing to expenses paid to NER -- paid by NER to my

13    mother, Janice Sylvester, and that of her three children --

14    myself, my sister Karina and brother Jackson.

15          The Court should know, however, that Mr. LoConte made

16    the sole decision as the court-appointed personal

17    representative of my father's estate to take all its liquid

18    assets to supposedly pay off NER's corporate debt, leaving the

19    estate without the means to meet its obligations and to pay

02:05  20    funds owed to my mother.  NER owed my father's estate some $3

21    million.  In addition, my mother, Janice, personally loaned

22    $500,000 to NER to fund its operations.

23          Mr. LoConte made the decision as the personal rep of

24    the estate and trustee to pay justifiable estate expenses to my

25    family by making payments through NER's operations and

1    accounts, payments totaling far less than the amounts by NER --

2    excuse me -- to the amounts owed by NER -- by NER to my mother

3    and the estate.

4          In addition, during his statement on March 5th, at the

5    March 5th hearing, Mr. LoConte claimed that one of the reasons

6    that he should not be incarcerated is that he started a new

7    company called Fina Stoneworks and that he needs to run that

8    company for the benefit of its employees.

9          In this plea for leniency, Mr. LoConte was not candid

02:06 10   with the Court.  The truth is that Fina was started as a

11   division of NER, which Mr. LoConte stole and put into his sole

12   ownership.  Fina was NER's stone shop located on NER's premises

13   and staffed by NER employees.  In 2017, Mr. LoConte transferred

14   NER stone fabrication and manufacturing business to himself for

15   no consideration.  For years after Mr. LoConte stole from NER,

16   he operated the business on NER's businesses utilizing NER

17   facilities, staffed with NER employees, paid by NER, and

18   outfitted two fabrication facilities with NER labor, all backed

19   by NER credit.  In fact, until only recently, the Fina website

02:07 20   stated that Fina was once a division of NER itself.

21         In short, the company that Mr. LoConte refers to here

22   as evidence of his new start is rather an entire business that

23   Mr. LoConte diverted from NER for his own sole benefit.  As a

24   sole owner, LoConte received at least $900,000 in cash

25   distributions from Fina, the amount of which was reported on

```
 1    Fina's tax returns.
 2            Furthermore, after Mr. LoConte placed NER stone
 3    manufacturing business into Fina with his sole ownership,
 4    Mr. LoConte for years continued to pass the salary expenses for
 5    Fina's business onto NER.  Mr. LoConte caused NER to pay for
 6    the payroll expenses for Fina's employees from at least 2019
 7    through January of 2022.  These payments totaled about $1.8
 8    million.  NER will never see that money.
 9            The Court should know this as the story he tells of a
10    repentant defendant ready to start fresh with a new business he
11    founded is, yet again, nothing more than another scam.
12            Mr. LoConte's actions have greatly damaged my family,
13    the legacy of my late father and grandfather, and most
14    importantly, NER.
15            As we begin to slowly rebuild, we would ask the Court
16    to impose a sentence that holds Mr. LoConte accountable for his
17    actions and the damage he has caused.
18            Thank you, your Honor.
19            THE COURT:  Thank you, sir.  Thank you.
20            Counsel, Mr. LoConte, you gave a statement when I last
21    saw you, which I think now was on March 5th, Ms. Hourihan, is
22    that the correct date?
23            Mr. LoConte, you're not required to make a further
24    statement, but I'd give you the opportunity.
25            (Defendant conferred with counsel.)
```

1          THE DEFENDANT:  No, thank you, your Honor.

2          THE COURT:  Okay.  Thank you.

3          Mr. LoConte, I've had an opportunity to reflect on all

4    of the information in the record before me, and I'm prepared to

5    announce and impose your sentence now.

6          Mr. LoConte, as you probably understand from your

7    counsel, to determine what a reasonable and appropriate

8    sentence would be here, I must consider, and I have considered,

9    the sentencing factors under Title 18, United States Code,

02:09 10   Section 3553(a).  Those factors include, but are not limited

11   to, the advisory guideline sentencing range that I discussed at

12   length with counsel on March 5th, the nature and circumstances

13   of the crimes that you committed, your personal history and

14   background, and the need for any sentence I impose to reflect

15   the seriousness of your offenses; promote respect for the law

16   and provide just punishment and adequate deterrence, not just

17   to you, but to others; and avoid unwarranted sentencing

18   disparities between similarly situated defendants.

19         Mr. LoConte, I've considered all of those factors in

02:10 20   deciding your sentence.  I want to summarize my consideration

21   of some of those factors.

22         First, I've considered the crimes to which you've pled

23   guilty:  Count One, mail fraud charged from January of 2014 to

24   September of 2021; and Count Ten, failure to pay over taxes

25   from September 2016 to April 2022, and Count Ten specifically

1    includes the third quarter 2021 payroll period.

2        All of this arises out of your leadership as president

3    of both NER, a construction company, and NEM, the management

4    company that runs the front office of NER.

5        Without needing to resolve what assistance you gave to

6    the company when you initially took the reins of these entities

7    or whether the Flowers payments, that is, the off-the-books

8    payments for overtime and cash or non-payroll checks, existed

9    before you were in place as president, it certainly remains

02:11 10    true on the record before me that you directed and approved

11    this scheme to continue during the period charged.

12        As a result, you caused the company to underreport

13    hours worked for employees to the unions and benefit funds and

14    did so without making the required payroll tax withholding and

15    payments.

16        Relatedly, you caused NER to file false or fraudulent

17    IRS Form 941s, these quarterly reports, which underreported the

18    wages which were being paid.  This resulted in no taxes being

19    paid over to the IRS for, again, these Flowers payments.

02:12 20    Numerous false Form 941s were filed with the IRS on your watch.

21        The total loss in benefit funds and dues money from

22    this scheme was between $550,000 and $1.5 million, as I find

23    reasonably calculated by the government and supported by a

24    preponderance of evidence.  The total tax loss is at least $3.5

25    million, as I find reasonably calculated by the government and

 1   supported by a preponderance of the evidence.  And I'll say

 2   more about that later.

 3          There were victims here.  Obviously we heard from one

 4   just now, and I've also considered the letters from the

 5   Massachusetts Laborers' Benefit Fund and the CPA for NER.

 6          First, the benefit funds were a victim, the funds that

 7   fund insurance and retirement and fringe benefits for its

 8   members; the employees of NER were also victims having been

 9   deprived of collectively bargained contribution to their fringe

02:13 10   benefits; and third, generally the public, that is, in the

11   status of the IRS in having not been able to collect these

12   taxes and the huge tax loss that's been incurred here.

13          My consideration of your crime is also -- I've also

14   considered the fact that you committed it over an extended

15   period of time and were, as the record reveals, warned at least

16   by one person that this scheme was improper, and all of that is

17   particularly concerning.

18          Mr. LoConte, however, I haven't just considered the

19   crimes to which you pled guilty.  I've considered your personal

02:13 20   history and background.

21          If I recall correctly, you're now 62 years old.

22          You were born in Somerville.

23          You were raised by your parents who still live in

24   Saugus, and you were raised along with your five siblings.

25          As attested by your self-report to the Probation

1    Department, and as the letters of support I received reflect,

2    you remain a close-knit family.

3          You enlisted in the Air Force at age 17.  You were

4    honorably discharged after a number of years of service.

5          You attended Northeastern but did not graduate but I

6    think you attended for close to four years.

7          You married in 1985 and were married until you

8    separated in March of 2011.  You have three children out of

9    that union ages 37, 25, and 33.  And your sons and their

02:14 10   families also live in Massachusetts.

11          You've been in a committed relationship for a dozen or

12    so years, and your partner works at one of the companies that

13    was referenced in the PSR.

14          And the letters of support from long-time friends,

15    colleagues, and at least one of your sons, if I recall

16    correctly, attest to your charitable work and support for

17    others, particularly in times of need.

18          You were gainfully employed for all of your adult

19    life, mainly at NER and NEM, which is the subject of the

02:15 20   charges against you in this case, and you were employed there

21    until 2022.

22          You've had self-employment at Front Street

23    Construction and Fina Stoneworks, which was made reference to

24    today as well, but I've considered that.

25          You've been out on pretrial release since October of

1    2022, and I've taken account of your compliance with your

2    conditions of release.

3            And you have no other criminal history that is scored

4    here, so you're a zero points offender, which is accounted for

5    in the advisory guideline sentencing range.

6            Third, Mr. LoConte, I've given a lot of consideration

7    to the advisory guideline sentencing range.  As I noted at the

8    outset of my remarks, there was much dispute between the

9    parties about those calculations.  I am adopting the advisory

02:16 10   guideline sentencing range for a total offense level of 21 and

11   a Criminal History Category of I.  In doing so, I should note

12   that I've considered your counsel's arguments about the loss

13   amount, but I conclude that the government's calculation is

14   reasonably calculated and supported by the preponderance of the

15   evidence, including specifically the affidavits it proffered

16   which were Exhibits Docket 77-1 and ones that followed those.

17           A few points on the loss amount.

18           There was much made about a settlement made in a civil

19   matter regarding the benefit funds, which I -- was clearly not

02:16 20   binding on this Court, particularly where I find the

21   government's calculations are reasonably supported by the

22   record that's before me.

23           I also think it's proper to include checks and amounts

24   less than $2,000, as explained in the government's affidavits.

25           I also don't think that the Flowers money is

1      overstated where the government has explained its calculations

2      in detail, and where so much of the Flowers payments were made

3      in office staff cash, which makes an exact calculation

4      difficult, but I think counting just the checks seems to

5      understate the loss.

6           As to the loss, the tax loss, Mr. LoConte,

7      specifically, I don't find a basis to conclude that taxes from

8      2020 to 2022 were properly deferred or that it was reasonable

9      for to you think that they were.  But for all of the reasons in

02:17 10      the record supporting the government's calculations, I accept

11      those loss amounts.

12           I also think it was appropriate, as Probation

13      calculated, to group the two charges in two different groups

14      pursuant to 3D1.2, because there were separate harms involved:

15      Count One at least to the NER employees and benefits funds, and

16      in Count Ten to the IRS and the general tax paying public.

17           I also think it was correct to apply the abuse of

18      trust enhancement under 3B1.3.  As I noted before, you were

19      president of both entities.  You certainly had discretionary

02:18 20      authority over the accounts, which was supported by some of the

21      witness statements that were cited by the government.  And your

22      position, quote, significantly facilitated the commission and

23      concealment of the offense, end quote, which is required for

24      the application of this enhancement.

25           Also, it was abuse of trust as to Count One where the

1    NER employees are certainly victims, and it's at least an abuse

2    of trust to them, so I've considered that.

3         I've considered as well, since the advisory guidelines

4    sentencing range is not the only factor before me, I've also

5    considered all of the goals of sentencing that I mentioned at

6    the beginning of my remarks, and I won't repeat them, but I

7    just want to make a few points.

8         I do have to consider just punishment and the

9    seriousness of your offense, which to me, as I suggested, is

02:19  10    serious, not just in its loss amount, but in its length of

11    time.

12         I've also considered the national JSIN data that 93

13    percent of defendants in your same criminal history and with

14    offense levels with the same primary guideline have received a

15    prison sentence.  The average length for the defendants who

16    have been sentenced to prison was 28 months and the median was

17    also 28 months.  All of the defendants in that category,

18    including those that did not get a period of incarceration, the

19    average was 26 months and the median was 25 months.

02:20  20         I don't agree with the length of the sentence that the

21    government is advocating based on all of the factors I've

22    considered, but I do agree that a period of incarceration is

23    warranted.

24         I've considered the summary of the cases that were

25    cited by your counsel in your sentencing memo in which

1    defendants received home confinement in some cases, but I would

2    just note those were for loss amounts that are less than those

3    that were reasonably calculated here, and they were also less

4    than the loss amount in a case that was recently before me,

5    U.S. v. Schofield, which counsel cited to me.  It was also not

6    clear in some of those cases from other sessions over what

7    period of time the crime was committed or if there were any

8    extenuating circumstances that were present there that are not

9    present in this case.

02:21 10         I've also considered the periods of imprisonment that

11    were imposed in other cases that were also cited in your

12    sentencing memo.

13         For all of these reasons, Mr. LoConte, I'm going to

14    impose a sentence of imprisonment of 20 months of

15    incarceration, three years of supervised release.  I'm going to

16    impose a low-end fine of $15,000, which would have been higher

17    but for the restitution that I'm going to impose; the mandatory

18    special assessment of $200; and restitution in the amounts that

19    the government seeks, which is, I believe, Ms. Kaplan,

02:21 20    $3,035,648 to the IRS, $596,462 to NER, and $1,094,504 to the

21    benefit funds.

22         Ms. Kaplan, is that correct?

23         MS. KAPLAN:  Yes, I believe so, your Honor.

24         THE COURT:  Mr. LoConte, for all of the reasons that

25    I've cited, I conclude that this sentence in all of its

1    components is a reasonable and appropriate sentence and is

2    sufficient, but not greater than necessary, to accomplish all

3    of the goals of sentencing that I've mentioned.

4         Counsel, does either side need to be heard before I

5    formally impose sentence?

6         MS. KAPLAN:  Your Honor, I'm sorry, can you just

7    repeat what the amount of restitution is?

8         THE COURT:  Sure.  And again, this was from, I think,

9    both your sentencing memo and even the chart that was included

02:22 10   in defense counsel's sentencing memo.  So, in the order in

11   which I recited them, $3,035,648 to the IRS; $596,462 to

12   NER/NEM; and $1,094,504 to the benefit funds.  I didn't break

13   that down further, but --

14        MS. KAPLAN:  Do you want to break down the amount of

15   money to the Mass. Department of Revenue?  Because we've got

16   that -- you've got that full 3 million 3 to the IRS, and

17   there's $210,570 of that that's owed to the Mass. Department of

18   Revenue.

19        THE COURT:  Counsel, I thought that that was an amount

02:23 20   that was included in the loss amount as relevant conduct but

21   not sought for the purposes of restitution.  But am I --

22        MS. KAPLAN:  No, we were seeking it as restitution as

23   well, your Honor.

24        THE COURT:  Okay.

25        MS. KAPLAN:  So it comes out of that full amount that

1    you cited to the IRS.

2            THE COURT:  It comes out of the 3,035,000?

3            MS. KAPLAN:  I believe so, your Honor.

4            So I believe what we were asking for to the IRS was

5    $3,035,648 to the IRS, $210,570 to the Mass. Department of

6    Revenue, and then the 596,462 to NER.

7            THE COURT:  Okay.

8            Does counsel need to be heard on the 210,570 to the

9    Department of Revenue in light of what I've otherwise found?

02:24 10            MS. PASCUCCI:  One moment, your Honor.

11            THE COURT:  Sure.

12            (Discussion off the record.)

13            MS. PASCUCCI:  Your Honor, as long as the overall

14    total of restitution does not change, we have no dispute if

15    some of it goes to Massachusetts as opposed to the IRS.

16            THE COURT:  Okay.

17            So, counsel, I'm not sure from the chart I have on

18    page 56, Docket 80, which is the defendant's sentencing memo,

19    if the $3,035,000 does include that amount, because I had

02:25 20    separately broken out the 596 number to NER, and, counsel, my

21    math is not that good to do it that quickly.

22            I think, counsel -- and either side can correct me if

23    I'm wrong, but I think the total amount of $3.8 was the amount

24    that included the 3 million figure to IRS, the 596 figure to

25    NER/NEM, and the 210 to the DOR.

1          MS. KAPLAN:  If I could just have one moment.

2          THE COURT:  Sure.

3          MS. KAPLAN:  Okay.

4          So I think you're correct.  The total tax loss the

5    government would argue is 3,842,680, you're right.  And then we

6    took out that $210,000 number for the Mass. Department of

7    Revenue.

8          THE COURT:  Okay.

9          MS. KAPLAN:  And we also backed out of that number, I

02:26 10   believe, the money -- the 596 that was owed to NER.

11         THE COURT:  Right.  But you are still seeking it in

12   restitution.

13         MS. KAPLAN:  Right.

14         THE COURT:  Counsel, with that said, do you need to be

15   heard?

16         MS. PASCUCCI:  No, your Honor.  We don't have

17   additional argument on that point.

18         THE COURT:  Okay.

19         So I will -- so let me just say these numbers

02:26 20   correctly for the record.

21         So the restitution I'm including is a total -- is a

22   total of $3,842,680.  Of that, $3,035,648 is to the IRS;

23   $596,462 is to NER/NEM; $210,570 is to the Mass. Department of

24   Revenue; and $1,094,504 is to the benefit funds.

25         MS. KAPLAN:  I believe that's correct, your Honor.

```
 1                THE COURT:  Okay.

 2                Counsel, before I formally impose sentence, does

 3       either side need to be heard?

 4                And let me just mention that I am going to -- I was

 5       planning to impose the special conditions that are indicated or

 6       suggested by Probation on the bottom of page 34, which largely

 7       relate to the restitution and the fine that I've just imposed.

 8                Does either side need to be heard either on that or

 9       anything else?

02:28 10         Ms. Kaplan?

11                MS. KAPLAN:  No, your Honor.

12                MS. PASCUCCI:  Your Honor, we would ask that he be

13       allowed to voluntarily surrender under 18 USC 3143(a).  The

14       standard is clear and convincing evidence if the person is not

15       likely to flee or pose a danger to any other person in the

16       community.  Given that he's been aware of these charges prior

17       to being indicted and given all that's going on, there's no

18       danger that he's going to flee.  He doesn't pose any danger to

19       the community.  And it also gives him an opportunity to get his

02:28 20    affairs and work in order and try to get Fina Stoneworks into a

21       position where it can continue to operate in his absence.

22                THE COURT:  Ms. Kaplan, any objection to that?  I

23       think we're usually picking a six-week out date.

24                MS. KAPLAN:  No objection.

25                THE COURT:  Ms. Hourihan, a date.
```

1          THE CLERK:  April 30th.

2          THE COURT:  April 30th.

3          Mr. LoConte, if can you please rise.

4          Sir, pursuant to the Sentencing Reform Act of 1984 and

5     having considered the sentencing factors, as I said, under

6     Title 18, United States Code, Section 3553(a), it is the

7     judgment of this Court that you're to serve a term of 20 months

8     in the custody of the Bureau of Prisons.  This term will be 20

9     months on Count One and 20 months on Count Two to be served

02:29 10    concurrently.

11          Upon your release from imprisonment, you shall be

12    placed on a term of supervised release for three years.

13          I am also going to impose restitution in the amounts

14    that I just stated, but just so it's all clear, in the amount

15    of $3,842,680, which is broken down into $3,035,648 to the IRS;

16    $596,462 to NER/NEM; and $210,570 to the Mass. Department of

17    Revenue; in addition, $1,094,504 to the benefit funds.  Those

18    payments will be made pursuant to a court-ordered repayment

19    plan.

02:30 20         I am imposing a low-end fine of $15,000, which will

21    also be paid pursuant to a court-ordered repayment plan.

22          In terms of your supervised release, you'll be subject

23    to certain mandatory and standard conditions of supervised

24    release.

25          Counsel, does your client waive the reading of those?

1      MS. PASCUCCI:  Yes, your Honor.

2      THE COURT:  In addition, sir, you'll be subject to

3 certain special conditions.  All of these conditions will be

4 reflected in the written judgment that I will issue, but I will

5 read the special conditions to you now.

6      You must pay restitution in the amount that I have

7 explained according to a court-ordered repayment schedule.

8      You must pay the balance of any fine or restitution,

9 as I said, pursuant to that schedule.

02:31 10      You're prohibited from incurring new credit charges or

11 opening additional lines of credit without the prior approval

12 of Probation while your financial obligations remain

13 outstanding.

14      You must provide Probation access to any requested

15 financial information, which may be shared with the asset

16 forfeiture unit of the U.S. Attorney's Office.

17      I further order that you pay the mandatory special

18 assessment of $200, which shall be due immediately.

19      And as I said, I will permit your self-surrender on

02:31 20 April 30th to the BOP facility to which you are designated.

21      You can be seated for the moment.  Thank you.

22      Ms. Kaplan, was there a dismissal that was going to be

23 made at this point?

24      MS. KAPLAN:  Yes, your Honor.

25      The government would move to dismiss Counts --

 1          THE COURT:  Is it Two through Nine and then Eleven

 2  through Thirteen?

 3          MS. KAPLAN:  I believe that's correct, your Honor.

 4          THE COURT:  Okay.  I will allow that motion.

 5          Counsel, to the extent that Mr. LoConte's appellate

 6  rights survive the waiver in his plea agreement, other than

 7  advising him of his appellate rights, any other matters?

 8          MS. KAPLAN:  The only thing I would ask, your Honor, I

 9  think some of this is statutory anyway, but that the

02:32 10  restitution be made first to the non-governmental victims in

11  this case, being NER and the benefit funds, before it goes to

12  the IRS.

13          THE COURT:  Okay.

14          I think that is statutory.  Meaning, I don't think I

15  have to say anything in my judgment for that to happen.

16          PROBATION OFFICER:  That's correct, your Honor.

17          THE COURT:  Thank you.

18          Anything else, counsel?

19          MS. PASCUCCI:  No, your Honor.  Thank you.

02:33 20          THE COURT:  Mr. LoConte, you may recall when I took

21  your guilty plea, I talked to you about the part of your

22  agreement in which you waived or gave up certain of your

23  appellate rights.  Do you recall that?

24          THE DEFENDANT:  I do.

25          THE COURT:  Mr. LoConte, to the extent that any of

1   your appellate rights survive that waiver, I advise you that

2   you can appeal your conviction or the sentence I've just

3   imposed.  If you're unable to pay the costs of appeal, you may

4   ask permission to have those costs waived and appeal without

5   paying.

6           You must file any notice of appeal within 14 days

7   after entry of my judgment, and if you request, the clerk of

8   this court will prepare and file a notice of appeal on your

9   behalf.

02:33 10         Do you understand?

11          THE DEFENDANT:  I do.

12          THE COURT:  Okay.

13          Thank you, counsel.

14          THE CLERK:  All rise.

15          (Court adjourned at 2:34 p.m.)

16              - - - - - - - - - - - -

17                  CERTIFICATION

18          I certify that the foregoing is a correct transcript

19   of the record of proceedings in the above-entitled matter to

20   the best of my skill and ability.

21

22

23

24   /s/Debra M. Joyce_____          April 1, 2024_____
     Debra M. Joyce, RMR, CRR, FCRR      Date
25   Official Court Reporter